# PORT OF PORTLAND ET AL. *v.* UNITED STATES ET AL.

No. 70–31.   Argued October 20, 1971—Decided June 29, 1972

BLACKMUN, J., delivered the opinion of the Court, in which all Members joined except POWELL and REHNQUIST, JJ., who took no part in the consideration or decision of the case.

*Lofton L. Tatum* argued the cause for appellants. With him on the briefs were *Raymond K. Merrill, Warren H. Ploeger, Oglesby H. Young, W. Harney Wilson, James H. Pipkin, Jr., Lee Johnson,* Attorney General of Oregon, *Dale T. Crabtree,* Assistant Attorney General, *Samuel P. Delisi,* and *Brenda P. Murray.* Messrs. *Merrill* and *Ploeger* filed a brief for appellant Chicago, Milwaukee, St. Paul & Pacific Railroad Co. *Solicitor General Griswold, Acting Assistant Attorney General Comegys,* and *Howard E. Shapiro* filed a brief for the United States in support of appellants.

*Fritz R. Kahn* argued the cause for appellee the Interstate Commerce Commission. With him on the brief were *Betty Jo Christian* and *Emmanuel H. Smith. Hugh L. Biggs, Roger J. Crosby, James Warren Cook, Richard Devers, Randall B. Kester, James H. Anderson,* and *John F. Weisser, Jr.,* filed a brief for appellees Spokane, Portland & Seattle Railway Co. et al.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case involves an order of the Interstate Commerce Commission, issued under § 5 (2) of the Interstate Commerce Act, as amended, 54 Stat. 905, 49 U. S. C. § 5 (2), authorizing the joint acquisition of a heretofore independent switching railroad at Portland, Oregon, by two of the four line-haul railroads serving that city. *Spokane, P. & S. R. Co. and Union Pacific R. Co.,* 334 I. C. C. 419 (1969). The switching railroad, Peninsula Terminal Co., is of current interest to the carriers because it provides an entrance route to the Rivergate Industrial District, a modern industrial and port complex being developed by the appellant, Port of Portland.

The two railroads authorized to acquire Peninsula are the Union Pacific Railway Co. (UP) and the Great Northern Pacific & Burlington Lines, Inc. (Burlington Northern), through its subsidiary, the Spokane, Portland & Seattle Railway Co. (SP&S).[1] The two other line-

---

[1] SP&S was formerly owned by the Great Northern Railway Co. and the Northern Pacific Railway Co. These two roads merged to become Burlington Northern. See *Northern Lines Merger Cases,* 396 U. S. 491 (1970). SP&S now operates as an integral part of that railroad. Reference to Burlington Northern in this opinion will include its SP&S operation, but SP&S often will be referred to in connection with the proceedings below, where it was the named party.

haul carriers now serving Portland—the Chicago, Milwaukee, St. Paul & Pacific Railroad Co. (Milwaukee) and the Southern Pacific Transportation Co. (SP)—sought to be included as joint purchasers of Peninsula under §§ 5 (2)(b), (c), and (d) of the Act, 49 U. S. C. §§ 5 (2) (b), (c), and (d), and sought trackage rights linking their lines with Peninsula. This appeal arises out of the Commission's denial—in disagreement with its hearing examiner's recommendations—of the petitions of Milwaukee and SP. Together with these two railroads, the Port of Portland and the Public Utility Commissioner of Oregon appeal from the decision of the three-judge District Court affirming, without opinion, the Commission's order. The United States joins the appellants in urging that the judgment below be reversed, while the Commission joins Burlington Northern and UP in urging affirmance. Probable jurisdiction was noted. 401 U. S. 906 (1971).

The question whether the Commission applied the correct legal standards is presented against the background of a complex factual situation—though this is not unusual in the case of railway mergers and acquisitions—and we find it necessary to go into detail concerning the facts and the proceedings prior to the submission of the case here.

## I

### A. The Rivergate Area and Peninsula's Relation to It

The developing Rivergate Industrial District occupies nearly 3,000 acres at the tip of the peninsula formed by the confluence of the Columbia and Willamette Rivers. Rivergate's six miles of waterfront will provide docksites for direct deepwater access to the Pacific Ocean. The Port of Portland has expended more than five million dollars of public funds for planning, construction, and development, and it is estimated that ultimate pub-

lic and private investment in industrial and port facilities at Rivergate will exceed 500 million dollars.

As conceived by its public developers, the Rivergate complex will be served by a domestic transportation network capable of providing efficient and economical service to and from points throughout the Nation. To achieve this goal, the Port's consultants recommended construction by the Port of an internal rail loop that would connect with existing carriers at the southwestern and eastern corners of Rivergate, thus providing Rivergate industries with direct access to all line-haul carriers serving Portland. At full development—estimated to be 15 years in the future—rail traffic generated by these industries is expected to reach between 500 and 600 cars per day, with a projected annual volume of five million tons of freight.

At present, eight industries [2] occupy about one-tenth of the Rivergate area. Seven of these are located on the west, or Willamette River, side of Rivergate, and are served by tracks owned by the Port of Portland. Outside rail access to this part of Rivergate is provided by tracks extending from UP's Barnes Yard (point 9 on the schematic map appended to this opinion) and connecting with the Port of Portland tracks. Over these external tracks, jointly owned by UP and Burlington Northern, UP provides switching service to the line-haul carriers serving Portland. It is expected that this Barnes Yard route will remain the southwest entrance to Rivergate.

---

[2] When the record closed below, the number of industries in Rivergate was five, four of which were located on the Willamette River side of Rivergate. App. 81. By the time the case had reached the Commission, another industry had located on the Willamette River side. According to the Brief for the Interstate Commerce Commission, p. 38, which no one has contradicted, two additional industries have now located on the Willamette River side.

The one other Rivergate industry—the poleyard of the Crown Zellerbach Corporation (Point E on the map)—is located at the easternmost edge of Rivergate, on the Columbia River. Outside rail access is presently provided by Peninsula, which serves, in addition, 13 industries located just southeast of the Rivergate boundary. Peninsula, organized in 1918 to serve a packinghouse facility long since closed, has a main track extending for only 8,000 feet along the Columbia River. At its easternmost end is the North Portland interchange (point 7 on the map), where Peninsula connects with lines owned by Burlington Northern and UP. Since the lines of these two line-haul carriers do not connect directly with Rivergate in this area, access to the eastern end of the Rivergate District is, at present, solely over Peninsula tracks.

Whether Peninsula tracks will remain the sole access to the eastern end of Rivergate is by no means certain. Peninsula suffers from certain physical limitations—its tracks are laid upon sand, its clearances are limited, and the main line is impeded by heavy curvature. Furthermore, the North Portland interchange tracks may have insufficient capacity for the expected Rivergate traffic. Accordingly, an alternate access route to the eastern end of Rivergate is under consideration, that is, a new spur leading directly to Rivergate from the Burlington Northern main north-south tracks.[3]

## B. The Proposed Purchase of Peninsula

All outstanding capital stock of Peninsula is owned by the United Stockyards Corporation. *Stockyards R. Co. Control,* 254 I. C. C. 207 (1943). United is not

---

[3] SP&S and UP had already provided for joint ownership of such a spur in their May 26, 1967, contract for the joint ownership of the line between Barnes Yard and the southwestern part of Rivergate. See Art. XI of this agreement, App. 313.

itself a carrier and has no interest in continuing to operate a railroad independent of its stockyard operation. It has been willing to sell Peninsula at the appraised value of its capital stock, and it has no preference as to the purchaser. On February 28, 1967, United entered into an agreement to sell Peninsula to SP&S and UP.[4]

By joint application filed with the Interstate Commerce Commission on July 25, 1967, SP&S and UP sought approval, under § 5 (2) of the Interstate Commerce Act,[5] of their contracted purchase of Peninsula

---

[4] The agreed purchase price is $299,405 for all outstanding shares of common stock of Peninsula plus the sum of $70,000 to reimburse United for two switch engines sold by United to Peninsula, and representing an unsecured account payable to United. Peninsula's properties consist of 13.17 acres of land, none suitable for industrial development, and a total of 3.79 miles of main line and secondary and spur track laid on treated ties in sand with no rock ballast. Besides the two above-noted locomotives, including tools and parts for their operation and maintenance, Peninsula owns tools for track maintenance, a conveyance for workmen, a heated engine house for both locomotives, a yard office, and a sand house.

[5] Section 5 (2) of the Act, 49 U. S. C. § 5 (2), provides in pertinent part:

"(a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

"(i) for . . . two or more carriers jointly, to acquire control of another through ownership of its stock or otherwise . . . .

. . . . .

"(b) Whenever a transaction is proposed under subdivision (a) of this paragraph, the carrier or carriers or person seeking authority therefor shall present an application to the Commission, and thereupon the Commission . . . shall afford reasonable opportunity for interested parties to be heard. . . . [A] public hearing shall be held in all cases where carriers by railroad are involved unless the Commission determines that a public hearing is not necessary in the public interest. If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public

from United Stockyards. The application pointed out that the acquisition would enable the applicants to provide rail service to the adjacent Rivergate area over the Peninsula tracks. Peninsula, however, would continue to operate as a separate carrier. No major changes in traffic or revenues were anticipated in the immediate future, though it was anticipated that "within the foreseeable future substantial new traffic and revenues" would be derived from the developing Rivergate area.

In response to the above application, Milwaukee and SP filed petitions seeking inclusion in the acquisition of Peninsula as joint and equal owners, pursuant to §§ 5 (2)(b), (c), and (d) of the Act; in addition, they sought the right to use tracks necessary to connect their own lines with Peninsula. The Commission's action on these petitions is the subject of the present appeal. The competing contentions are closely related to the facts of the interconnections between the four line-haul carriers near Rivergate, and to these we now turn.

---

interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable . . . .

"(c) In passing upon any proposed transaction under the provisions of this paragraph, the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected.

"(d) The Commission shall have authority in the case of a proposed transaction under this paragraph involving a railroad or railroads, as a prerequisite to its approval of the proposed transaction, to require, upon equitable terms, the inclusion of another railroad or other railroads in the territory involved, upon petition by such railroad or railroads requesting such inclusion, and upon a finding that such inclusion is consistent with the public interest."

## C. Carrier Interconnections and Switching Arrangements

### (1) The North Portland Interchange

At the North Portland interchange (point 7 on the map), where Peninsula connects with Burlington Northern and UP, are four interchange tracks. Two of these are jointly owned by Burlington Northern and UP; the remaining two are owned half by Peninsula, and the other half jointly by Burlington Northern and UP. Only one of these four tracks—one of the two jointly owned by Burlington Northern and UP—connects directly to the Burlington Northern double main-line tracks, running to the north across the Columbia River. In addition, the interchange tracks connect to a single UP track, which extends south through a mile-long tunnel to the UP's Albina Yard (point 6 on the map), a distance of 5.2 miles.[6]

At the time of the hearing in this case, about 30 cars were handled daily at the North Portland interchange. About 61% of this traffic involved switching between the predecessors of Burlington Northern on the one hand and UP and its subsidiaries on the other. Only the remaining 39% involved switching cars designated to or from industries served by Peninsula.[7] As the only two line-haul carriers connecting

---

[6] Although the map reproduced in the Appendix does not make this clear, trains coming north on the UP track from Albina Yard may enter directly upon the Burlington Northern double main-line tracks just south of North Portland, without passing through the North Portland interchange.

[7] These percentages are based on the figures for loaded or partly loaded cars interchanged at Peninsula during 1967: 2,748 cars designated to or from Peninsula industries; 4,300 interchanged between UP and the predecessors of Burlington Northern. It is not clear from the record how the total figure of 7,048 cars is translated into 30 cars per day—perhaps empty cars are included—but none of the parties disputed the daily or annual figures.

directly with Peninsula at North Portland, Burlington Northern and UP provide reciprocal switching to any other line-haul carrier whose cars are designated to or from industries served by Peninsula.[8]

(2) The Southern Pacific Connection

Although SP is a line-haul carrier serving Portland, its tracks terminate in East Portland (point 5) and at the Hoyt Street Yard on the other side of the Willamette River (point 3). SP cars designated for industries served by Peninsula are generally switched to UP trains at the latter's Albina Yard (point 6) and moved

---

[8] In *Switching Charges and Absorption Thereof at Shreveport, La.,* 339 I. C. C. 65, 70 (1971), the Commission has explained "reciprocal switching" as follows:

"It has long been a common practice among the railroads to participate at commonly served terminal areas in what is called reciprocal switching. In practice this means that one line-haul carrier operating within the terminal area will act only as a switching carrier in placing cars at industries on its own trackage for loading or unloading, as an incident of the line-haul movement of those cars over another carrier whose trackage in that terminal area does not extend to the serviced industry. The carriers reciprocate in their roles as switching and line-haul carriers at this terminal in accordance with the flow of traffic to and from industries on their respective trackage. In theory the carriers mutually exchange their switching services in these terminal areas, with the effect of extending the lines of each carrier to the other's industries—even on traffic for which they may be directly competitive as line-haul carriers. The scope of these reciprocal switching services is, of course, defined in the carriers' respective tariffs, either by definition of a specific area of trackage, or by identification of the particular industries for which reciprocal switching is held out. Frequently, the switching charges made applicable by each carrier for reciprocal switching are constructed without regard to the actual cost of the service, on the theory that these mutually incurred costs balance out each other. In many instances the line-haul carrier absorbs the reciprocal switching charge, thus placing the off-line industries within a given terminal area on an identical rate basis with its own on-line industries in that terminal area."

thence to the North Portland interchange, where they are switched by Peninsula itself to their ultimate destination. Alternatively, the cars may be switched to SP&S trains at the Hoyt Street Yard and moved to North Portland over the SP&S mainline. In either case, SP must pay a switching charge to Burlington Northern or to UP (whichever is the switching carrier), and then pay a "rate division" to Peninsula for its switching service.[9] The Peninsula rate division is absorbed by any line-haul carrier subject to it and is thus not passed on to the shipper. The SP&S and UP switching charges may be absorbed by a line-haul carrier if a minimum line-haul revenue per car is exceeded, and SP has done so, except on certain low-rated noncompetitive traffic. SP shared in about 20% of Peninsula's traffic in 1966, and in about 17% in 1967.

(3) Milwaukee's Presence in Portland

Throughout the proceedings below, Milwaukee was not a line-haul carrier serving Portland. Its own tracks terminate at Longview, Washington, 46 miles north of Portland, and through arrangements with SP&S it shared in only one percent of Peninsula's traffic in 1966 and 1967. However, a basic condition of the Commission's approval of the merger of the Great Northern Railway Co., the Northern Pacific Railway Company, and their affiliates, including SP&S, was that Milwaukee be made an effectively competitive transcontinental carrier by being permitted to enter Portland over the lines of the new company, Burlington Northern.[10] Condition

---

[9] In other words, Peninsula is compensated for its switching service in these cases by a flat division of the line-haul rates. At the time of hearing below, the charge generally amounted to $29.25 per car when the car revenue exceeded $60. App. 79.

[10] The Commission approved the merger on November 30, 1967. *Great Northern Pacific & Burlington Line, Inc.—Merger, etc.—Great Northern R. Co. et al.*, 331 I. C. C. 228, modified Apr. 11, 1968,

24(a) of the merger required that Burlington Northern

"shall grant to the Milwaukee, upon such fair and reasonable terms as the parties may agree or as determined by this Commission in the event of their inability to agree, trackage rights to operate freight trains over [Burlington Northern] lines between Longview Junction and Portland, including the right to serve on an equal basis all present and future industries at Portland and intermediate points and the use of [Burlington Northern] facilities at Portland necessary for the switching of traffic to other railroads and industries. [Burlington Northern] shall maintain Portland as an open gateway on a reciprocal basis with the Milwaukee to the same extent as with other connecting carriers . . . ." 331 I. C. C. 228, 357.

Pursuant to Condition 24(a), Milwaukee commenced service to Portland on March 22, 1971.[11] Since that

---

331 I. C. C. 869. This Court ultimately affirmed. *Northern Lines Merger Cases,* 396 U. S. 491 (1970).

Why direct access to Portland was critical to the Milwaukee is made clear by the following quotation from the three-judge District Court opinion in what became the *Northern Lines Merger Cases:*

"Neither Great Northern nor Northern Pacific would interchange traffic with Milwaukee [at Longview, Washington] except in circumstances which gave Northern Lines the longest possible haul over their own roads. This privilege of Northern Lines not to 'shorthaul' themselves means that traffic originating on the Milwaukee east of of the Twin Cities [and] destined for Portland or California was required to be turned over to one of the merging lines at the Twin Cities. As a consequence, Milwaukee was precluded from being a true transcontinental competitor and was unable to make full use of its extensive trackage ending only a few miles short of Portland. Moreover, Milwaukee was completely precluded from the extensive North-South traffic on the West Coast." 296 F. Supp. 853, 865 (DC 1968).

[11] Since the instant case was litigated below on the express assumption that the Northern Lines merger, and the accompanying condi-

date, it has published rates reflecting single-line service to Portland industries, including those served by Peninsula, by absorbing the relevant switching charges. It has operated its own locomotives over Burlington Northern lines as far south as the Hoyt Street Yard on the western side of the Willamette River (point 3). If Milwaukee is not allowed to switch cars directly to Peninsula at the North Portland interchange, Milwaukee cars designated for industries on Peninsula will be switched to Burlington Northern trains at Vancouver, on the north side of the Columbia (point 8), at the Hoyt Street Yard (point 3), or at the Guild's Lake Yard (point 2), and moved thence to Peninsula.[12]

## D. *Milwaukee and Southern Pacific Pleadings Before the Commission*

By petition filed August 23, 1967, Milwaukee sought inclusion in the proposed purchase of Peninsula by Burlington Northern (then SP&S) and UP. Section 5 (2)(d) of the Interstate Commerce Act authorizes the Commission to require such inclusion as a prerequisite to its approval of the purchase "upon a finding that such inclusion is consistent with the public interest." After first setting out its impending access to Portland over SP&S lines because of the Northern Lines merger, Milwaukee alleged:

"The instant transaction, if approved by the Commission without inclusion of Milwaukee upon the terms stated below, would have the effect of

tion, would ultimately be affirmed, the Milwaukee's current operation does not constitute a "change in circumstances" so much as a realization of the assumption.

[12] The briefs do not clearly reflect under what arrangements Milwaukee cars have been reaching Peninsula since March 22, 1971, though it is plain that Milwaukee trains have not been moving directly to the North Portland interchange.

foreclosing Milwaukee direct service to all the industries now or in the future to be located on the lines of Peninsula Terminal Company. With fifty per cent of Peninsula Terminal Company stock in the hands of Union Pacific Railroad Company, not a party to the contract referred to above, Milwaukee will not have any right similar to that sought by applicants herein . . . to operate over or obtain trackage rights in the lines of Peninsula Terminal Company. Industries on the lines of Peninsula Terminal Company will thus be denied the single-line service of Milwaukee to such points as [various western and midwestern rail centers served by Milwaukee], contrary to the public interest." [13]   App. 165.

Accordingly, the Milwaukee sought equal inclusion with SP&S and UP in the purchase of Peninsula and, in addition, asked

"[t]hat Milwaukee be granted the right to acquire trackage rights over intervening connecting trackage jointly owned by applicants, from SP&S main line to Peninsula Terminal Company's lines upon such reasonable terms and conditions, and for such considerations, as Milwaukee and applicants may negotiate, or, failing such negotiations, upon such

---

[13] The contract here referred to is a 1966 agreement between Milwaukee and the Northern Lines, the terms of which were incorporated in large part into the Commission's conditions accompanying the approval of the Northern Lines merger. In particular, the agreement provided that Milwaukee could operate over SP&S lines as far south as the Hoyt St. Yard, and that SP&S would provide switching of Milwaukee cars at Vancouver and Portland "to or from industries and connecting carriers to the extent such service is performed by [Burlington Northern] or SP&S for itself or any other carrier." These provisions were the direct predecessors of the vaguer Condition 24 (a), quoted above.

terms and conditions and for such consideration as the Commission may find just and reasonable." [14] App. 166.

On December 29, 1967, SP&S and the UP filed replies, arguing, *inter alia:* (1) that even if Condition 24 (a) were implemented, Milwaukee would still not connect with Peninsula because of the intervening North Portland interchange tracks, jointly owned by SP&S, UP, and Peninsula, and trackage rights over these tracks could not be granted to the Milwaukee in this proceeding; and (2) that joint ownership of Peninsula with the Milwaukee could "lead to a cumbersome, confused and divided management with resulting policy stalemates and serious deterioration of service."

Milwaukee thereupon filed a supplement to its petition for inclusion, stating that

"in light of the replies of applicants herein to the Milwaukee's petition for inclusion, the Milwaukee alleges that the joint application herein is for the purpose of bottling up the Milwaukee at Portland and impair [*sic*] its ability to provide a competitive service to industries served or to be served by Peninsula Terminal Company contrary to the public interest and the plain intent of the Commission's [report and order in the *Northern Lines Merger Case*]." App. 182.

Accordingly, the Milwaukee added to its earlier petition by requesting:

"That applicants be required to grant Milwaukee trackage rights over intervening trackage at North

---

[14] A source of confusion in this case has been the extent to which various carriers either would possess or sought to possess trackage rights over Peninsula's main track (as opposed to the interchange tracks at North Portland), so the reader is alerted to tread carefully through the descriptions of the pleadings and the opinions below.

Portland connecting with the yards of Peninsula Terminal Company, both as a condition to participation in ownership of Peninsula Terminal Company *and also under Section 3 (5) of the Interstate Commerce Act."* App. 183. (Emphasis added.)

Whether intentionally or not, by requesting trackage rights under § 3 (5), the text of which appears in the margin,[15] Milwaukee divorced the question of *access* to Peninsula from the question of *inclusion in the ownership* of Peninsula. Any trackage rights granted in connection with the petition for inclusion under § 5 (2) would be contingent upon SP&S' and UP's deciding to consummate the purchase; trackage rights granted under § 3 (5), however, would be independent of the purchase.

In the meantime, by an amended petition filed November 29, 1967, SP joined with the Milwaukee in seeking inclusion under § 5 (2)(d) as an equal owner of Peninsula. It further requested that UP

"be required to grant petitioner bridge trackage rights over [the Union Pacific] main line and terminal trackage between Peninsula Terminal Com-

---

[15] Section 3 (5) of the Act, 49 U. S. C. § 3 (5), provides in pertinent part:

"If the Commission finds it to be in the public interest and to be practicable, without substantially impairing the ability of a common carrier by railroad owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power by order to require the use of any such terminal facilities, including main-line track or tracks for a reasonable distance outside of such terminal, of any common carrier by railroad, by another such carrier or other such carriers, on such terms and for such compensation as the carriers affected may agree upon, or, in the event of a failure to agree, as the Commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensation in condemnation proceedings. . . ."

pany and the Southern Pacific-Union Pacific track connection at East Portland, Ore." [16]   App. 168.

In response to replies that trackage rights to East Portland could not be granted in a § 5 (2) proceeding, SP, unlike Milwaukee, initiated separate proceedings under § 3 (5) (Dec. 19, 1967). It sought orders requiring SP&S and UP to allow the "common use of Peninsula Terminal Company," together with bridge trackage rights over UP lines to East Portland; additionally (or, presumably, alternatively), it sought the "common use of the terminal facilities of Union Pacific between Peninsula Terminal Company and . . . East Portland, Oregon." [17]

*E. Proceedings Before the Hearing Examiner*

The applications, petitions, and replies of the four line-haul carriers were referred to an examiner for hearing upon a consolidated record. The Port of Portland, the Portland Commission of Public Docks, the Public Utility Commissioner of Oregon, and Crown Zellerbach Corporation intervened in favor of Milwaukee and the

---

[16] We are told that "bridge trackage rights," permitting SP only to haul cars from one end of the line to the other, are to be contrasted with "full user rights" or "common use," which would permit SP to serve any industries located along the UP track. See Brief for Appellees SP&S and UP 27.

[17] Like Milwaukee, SP had mentioned § 3 (5) in connection with its § 5 (2) petition for inclusion, asking for

"trackage rights between East Portland and the yards of Peninsula Terminal Company, both as a condition to participation in ownership of Peninsula Terminal Company, and also under section 3 (5) . . . , independently of the request for participation in ownership." App. 169.

The hearing examiner and the Commission treated this § 3 (5) request as having been superseded by SP's separate § 3 (5) proceedings, which, if anything, sought broader relief. We do likewise.

SP.[18] At the hearings in February and March of 1968, evidence was taken from five shippers in addition to Crown Zellerbach, as well as officers and consultants of the parties and intervenors.

On September 9, 1968, nearly a year after the Commission had approved the Northern Lines merger, the hearing examiner issued his report. In the § 5 (2) proceeding, he recommended approval of the purchase of Peninsula by Burlington Northern and UP, on condition (1) that SP be included as an equal owner and (2) that Milwaukee be included as an equal owner upon consummation of the Northern Lines merger and upon Milwaukee's commencing operations into Portland.[19] The examiner further recommended that if the purchase were consummated on the above conditions, SP and Milwaukee be granted

> "the right of access . . . to Peninsula Terminal Company trackage over intervening North Portland interchange tracks, at North Portland, Oreg., presently owned individually or jointly by [Peninsula, SP&S and Northern Pacific, and UP], upon such terms and compensation for use of such inter-

---

[18] Eight railway employee organizations opposed the petitions and applications of Milwaukee and SP. None of their contentions are before us now.

[19] In return for inclusion in the purchase of Peninsula, SP and Milwaukee were to be required to make equal contribution to the cost of the shares of capital stock and the locomotive equipment of Peninsula.

Milwaukee's inclusion in the purchase was made contingent, not only on ultimate approval of the Northern Lines merger, but also upon Milwaukee's filing a § 1 (18) request for a "certificate of convenience and necessity authorizing railroad operation between Longview Junction, Wash., and Portland, Oreg." Given Condition 24 (a), the Commission rejected the proposition that a § 1 (18) certificate would be necessary before Milwaukee could begin operating in Portland, and the question is not before us on appeal.

vening trackage mutually agreeable to the interested carriers, or in the event of failure to agree, as the Commission may fix as just and reasonable, to be ascertained in accordance with the provisions of section 3 (5) . . . ." App. 128–129.

The examiner found that this right of access "is practicable and would not substantially impair the ability of the owning carriers to handle their business." [20] App. 129.

In the separate § 3 (5) proceedings initiated by SP, the examiner ordered common use by SP of the tracks and facilities of UP for operation between the connection at East Portland and the tracks of Peninsula at North Portland, conditioned, again, upon compensation to be agreed upon by the parties or "just and reasonable" as fixed by the Commission.

In his discussion of the issues, the hearing examiner first announced that he would treat the entire area in-

---

[20] Did this § 5 (2) order grant SP the trackage rights it sought from the Albina Yard? SP contended below that it did, arguing that the only individually owned track in the area that was relevant to the issue was the UP track from North Portland to the Albina Yard, and that the examiner did seem to have in mind all *intervening* tracks. To protect itself on this point, however, SP filed an exception to the hearing examiner's recommendations, arguing that he *should* have granted the requested trackage rights under § 5 (2).

As for Milwaukee's apparent effort to claim a § 3 (5) right to trackage over the North Portland interchange tracks, see Milwaukee's Supplement to Petition for Inclusion, quoted *supra,* we can only say that it was handled very ambiguously by the hearing examiner. The best explanation of his action is that he deemed it unnecessary to grant trackage rights to Milwaukee under § 3 (5), since he was granting them under § 5 (2). Alternatively, he may have thought that Condition 24 (a) gave Milwaukee trackage rights over the North Portland interchange. Milwaukee did not file an exception on this issue and has not pressed it on this appeal. Cf. Brief for Appellants 34.

volved as "one transportation terminal entity." On the subject of inclusion in the purchase of Peninsula, he announced:

"Existing disparity in charges and treatment of traffic within the Portland switching area is convincing evidence that the greatest economic advantage for equality of shippers and carriers can be accomplished best by equal access and ownership. The most economical and functionally modern transportation facilities are essential to development of Rivergate and the Port of Portland. Limitation of direct access there to two railroads barring on-line solicitation and the direct development interests of the other railroads serving the Portland area is contrary to an environment of unencumbered development and the establishment of a sound transportation system. . . . [D]irect access to all the carriers will enable shippers to deal directly with originating carriers providing on-line service to many points in areas not served by the two initial applicants. Shippers would benefit from elimination of switching charges assessed on non-competitive traffic where one of the applicants now acts as a switching carrier." App. 120–121.

On the subject of the SP's § 3 (5) applications, the examiner found that the evidence warranted a conclusion that common use by SP of UP trackage between the North Portland interchange and East Portland was "in the public interest, practicable, and would not substantially impair UP's ability to handle its own business." He noted the "almost incredible 30-hour average transit time required for car movements between Albina Yard and Peninsula, a round-trip distance of about 10.4 miles, including engine changes, car inspection, and car classification at Albina Yard." With

respect to the developing Rivergate complex, the examiner was convinced

> "that access thereto by other line-haul carriers will create greater incentive for improvement of railroad facilities and for elimination of present unsatisfactory conditions in the involved area." App. 124.

Nor did the examiner think that joint ownership and access by the four line-haul railroads in Peninsula and the proposed trackage rights to SP would curtail competition.

> "To the contrary, shippers in the involved area would be afforded free direct access to all the line-haul carriers' services. Among other things, it would place traffic movements between the Portland area, on the one hand, and, on the other, on-line points of carriers in California and States east thereof, on a more competitive basis with movements between those points over the lines of UP and [Burlington Northern] . . . . Also, Milwaukee would become more competitive with UP and [Burlington Northern] and their connections in providing service to the north and east of Portland. The authorizations, generally, would result in improved competitive service and the fostering of sound transportation in the involved area." App. 125.

Finally, the examiner did not grant SP's apparent application, pursuant to § 3 (5), for trackage rights over Peninsula itself. He concluded his discussion with the words:

> "In event the parties elect not to consummate the purchase [of Peninsula] recommended herein further petitions by these carriers requesting access to and operation over trackage of Peninsula pursuant to

section 3 (5) of the Act may be filed. Jurisdiction will be retained for that purpose."[21]    App. 127.

## F. The Decision of the Interstate Commerce Commission

Burlington Northern and UP filed exceptions to the hearing examiner's recommendations.  They contended, *inter alia,* (1) that undue emphasis was placed on the future development of Rivergate, (2) that the hearing examiner erroneously held the Portland terminal area to constitute one terminal entity, (3) that the evidence does not support a four-way ownership of Peninsula, either from a general public or a shipper standpoint, (4) that Condition 24 (a) did not grant Milwaukee access to Peninsula, and (5) that neither use of the North Portland interchange tracks by Milwaukee and SP, nor common use by the SP of UP trackage between North Portland and East Portland, was in the public interest.[22]

On June 6, 1969, Division 3 of the Interstate Commerce Commission issued its opinion.  334 I. C. C. 419.

---

[21] Whether or not SP had in fact sought, under § 3 (5), the right to operate over Peninsula's main track was the subject of strenuous dispute before the hearing examiner.  Counsel were unable to agree on the meaning of "common use," so the result of the interchange is not perfectly clear, but SP's counsel appeared to concede that his client sought no more than the right to operate to the North Portland interchange and to connect there with Peninsula (in addition, of course, to equal ownership in the stock of Peninsula).  In any event, it is clear that the hearing examiner did *not* recommend granting any right to operate over the Peninsula main track, and we note that SP did not file an exception on this matter.

[22] SP&S and UP contended, in addition, that SP and Milwaukee are not "railroads in the territory involved" within the meaning of § 5 (2) (d), and that the Commission, accordingly, did not have jurisdiction to include these two lines in the purchase of Peninsula. The Commission squarely rejected this contention, and since SP&S and UP do not raise it in their briefs here, we assume that the Commission decided the question correctly and discuss it no further.

Though it approved the acquisition of Peninsula by SP&S and UP, it otherwise rejected the hearing examiner's recommendations and denied the petitions and applications filed by Milwaukee and SP. The following conditions were imposed upon the acquisition, "to protect the present routings and interchanges" of Peninsula:

"1. Under the control of SP&S and UP, Peninsula shall maintain and keep open all routes and channels of trade via existing junctions and gateways, unless and until otherwise authorized by the Commission;

"2. The present neutrality of handling inbound and outbound traffic to and from Peninsula by SP&S and UP shall be continued so as to permit equal opportunity for service to and from all lines reaching Peninsula through SP&S and UP without discrimination as to routing or movement of traffic, and without discrimination in the arrangements of schedules or otherwise;

"3. The present traffic and operating relationships existing between Peninsula, on the one hand, and, all lines reaching Peninsula through the lines of SP&S and UP, on the other, shall be continued insofar as such matters are within the control of SP&S and UP;

"4. Peninsula, SP&S and/or UP shall accept, handle, and deliver all cars inbound, loaded and empty, without discrimination in promptness or frequency of service irrespective of destination or route of movement;

"5. Peninsula, SP&S and/or UP shall not do anything to restrain or curtail the right of industries, now located on Peninsula, to route traffic over any and all existing routes and gateways;

"6. Peninsula, SP&S and/or UP shall refrain from closing any existing route or channel of trade with SP or Milwaukee on account of the [authorized purchase of Peninsula], unless and until authorized by this Commission;

"7. Consummation of [the authorized purchase of Peninsula] shall constitute assent by the corporate parents of SP&S, the members of their respective systems, and any carrier resulting from consummation of the Northern Lines case, to be bound by these conditions to the same extent that SP&S is bound by these conditions; and

"8. Any party or person having an interest in the subject matter may at any future time make application for such modification of the above-stated conditions, or any of them, as may be required in the public interest, and jurisdiction will be retained to reopen the proceeding on our own motion for the same purpose." 334 I. C. C., at 436–437.

## II

### A. *"Direct Access"*

As a reading of Part I reveals, there seems to have been a certain amount of confusion below as to whether or not actual operation over the main tracks of Peninsula by any of the four line-haul carriers was at issue in this case. Early in the Commission's discussion of the merits, for example, it said:

"[W]e find that since neither SP nor Milwaukee now connect with Peninsula, and have never connected with it in the past, *their direct service to Peninsula's industries* over the objections of SP&S and UP would constitute a new operation and an invasion of the joint applicant's territory." 334 I. C. C., at 433 (emphasis added).

Laying aside the substantive policy involved in this statement, we do not see how the italicized words can refer to anything but physical operation over tracks wholly owned by Peninsula. Yet, as we have already seen *supra,* at 828–829, and n. 20, and 832 n. 21, the hearing examiner did not recommend the granting of such trackage rights to Milwaukee and SP; and neither of these two railroads filed exceptions to the hearing examiner's report requesting such rights. As for Burlington Northern and UP, the third condition which the Commission imposed on their purchase of Peninsula (quoted *supra,* at 833) seems to acknowledge that Peninsula will continue to operate as a separate railroad, handling all the switching from industries located upon its lines to the North Portland interchange tracks.

This matter was not resolved before this Court. The briefs filed by the appellants and by the United States contain many references to "direct access" by the line-haul carriers to Peninsula and Rivergate, again strongly suggesting physical operation over Peninsula tracks. The Commission argues that physical operation on the part of Burlington Northern and UP is not at issue, because ownership alone—all that these two railroads seek—gives no right to operate over the tracks of the purchased railroad. Brief for Interstate Commerce Commission 23 n. 15; Tr. of Oral Arg. 30. Milwaukee denies that it ever sought "to switch cars to Peninsula industries with its own engines and crews," Supplemental Brief for Appellant Milwaukee 34, but no similarly direct statement has been forthcoming from SP.

We have set forth but one of the confusions—factual and procedural—that plague this case. Such confusions might have been resolved before the case reached us had the three-judge court that initially reviewed these orders written an opinion.

## B. *The Petitions for Inclusion*

### (1) Condition 24 (a)

Milwaukee and the United States argued at length before this Court that Condition 24 (a) of the Northern Lines merger by itself requires that Milwaukee be included in the purchase of Peninsula. The Commission considered this point at the very start of its discussion of the merits and stated that Milwaukee's petition for inclusion could not be viewed

> "as part of the general realignment of western railroad competition resulting from the Commission's approval of the *Northern Lines* merger. Condition No. 24 . . . is applicable only to *Northern Lines* trackage and territory. The condition is silent with respect to trackage and territory in which other carriers, such as UP, have a joint interest and the effect of the condition upon such joint trackage and territory was not presented to, nor considered by, the Commission. Furthermore, . . . the purchase of Peninsula by the joint applicants was not within the contemplation of the Commission at the time condition No. 24 was imposed. . . . Accordingly, we consider the petition of Milwaukee under the same public interest criteria as the petition and applications of SP, rather than as a petition to carry out the provisions of condition No. 24.[10]" 334 I. C. C., at 432.

In its footnote 10, however, the Commission said:

> "Upon completion of litigation in the *Northern Lines* case and consummation of that merger, Milwaukee may wish to seek relief from the Commission in that proceeding to determine the relationship of condition No. 24, if any, to Peninsula's tracks

which would at that time be partially owned by the Northern Lines." *Ibid.*

This suggestion that the Commission might consider anew the effect of Condition 24 (a) upon jointly owned tracks leaves us in doubt whether at this point it has made a final determination on the applicability of the condition, or simply a determination that the question should be raised in a different proceeding. We do not find it necessary, however, to resolve this doubt and to rule upon the narrow question whether Condition 24 (a) alone requires that Milwaukee be included in the purchase of Peninsula. No one disputes that the condition had one clear meaning—that Milwaukee would be permitted to run its trains into Portland over Burlington Northern-SP&S tracks. The Commission took this as its starting point and went on to discuss the merits of both Milwaukee's and SP's petitions for inclusion. We find, for the reasons that will appear below, that the Commission took too narrow a view of the "public interest" and we are in disagreement with its § 5 (2) order.

(2) Evaluating the Public Interest

As an initial matter, the Commission limited its attention to Peninsula alone, rather than considering the "entire Portland area" as "one transportation terminal entity," as the hearing examiner had. Appellants contend that this very first step was error, but we think it wiser to evaluate the Commission's approach as a whole.

A fair summary of the Commission's analysis appears in the last paragraph of its discussion of the petitions for inclusion. There it concludes:

"The adverse effect on SP&S and UP, and the shippers dependent upon them for service, of ad-

mitting SP and Milwaukee into ownership and control of Peninsula, would outweigh any advantage accruing to SP, Milwaukee, and the Rivergate industries of four-railroad ownership. We cannot find, therefore, that inclusion of SP and Milwaukee in the title proceeding would constitute a just and reasonable term, condition, or modification of the authority requested by the joint applicants." 334 I. C. C., at 435.

In the preceding paragraphs, the Commission had summarized the evidence presented by the three shippers located in Rivergate that had supported SP's petition and application; it concluded that this evidence failed to establish that benefits would accrue from four-railroad ownership. No mention was made of evidence that tended to establish that "shippers dependent upon" SP&S and UP would suffer from such ownership. It is apparent, therefore, that the dominant factor in the Commission's analysis, outweighing any advantage accruing to SP and Milwaukee from four-railroad ownership, was the "adverse effect on SP&S and UP"; we must examine now the manner in which the Commission characterized this "adverse effect."

First, the Commission said:

"[W]e find that since neither SP nor Milwaukee now connect with Peninsula, and have never connected with it in the past, their direct service to Peninsula's industries over the objections of SP&S and UP would constitute a new operation and an invasion of the joint applicant[s'] territory." *Id.,* at 433.

We have already observed that this passage suggests direct physical operation over the main track of Peninsula, a matter that appears not to be directly at issue in this case. But it may also refer to the trackage

rights sought by Milwaukee and SP, as a condition to the purchase, which would permit them to connect directly with Peninsula, so the Commission's further treatment of this point is relevant:

> "In the past, the Commission has usually held that sound economic conditions in the transportation industry require that a railroad now serving a particular territory should normally be accorded the right to transport all traffic therein which it can handle adequately, efficiently, and economically, before a new operation should be authorized. This conclusion is applicable not only with respect to existing traffic but also with respect to potential traffic . . . . See *Minneapolis, St. P. & S. S. M. R. Co. Acquisition,* 295 I. C. C. 787, 802 [1958], and cases cited therein." *Ibid.*

This passage appears to announce the principle that in considering petitions for inclusion in proposed purchases or mergers under § 5 (2), with accompanying trackage rights, the dominant policy is preservation of the market shares of the railroads already serving the location in question, so long as those railroads provide reasonably adequate switching service to other carriers in the area. Whatever doubts we might have, either as to the principle itself or its application to this case, are removed by the critical paragraph that immediately follows the sentences just quoted:

> "As shown in the appendix, SP shared, through connections and use of joint rates and routes, in only about 20 percent of Peninsula's traffic during 1966, and only about 17 percent during 1967. Milwaukee's share, also via connections and joint rates and routes, amounted to only 1 percent during those years. Permitting SP and Milwaukee to acquire access to, and equal ownership of, Peninsula and

> therefore participate in its existing traffic on a direct haul basis will, of course, allow those two railroads to increase their share of Peninsula's declining traffic (3,640 loaded cars handled in 1966 and 2,748 handled in 1967). These increased shares of SP and Milwaukee could only be at the expense of the joint applicants and the railway employees whose jobs would be eliminated by the direct service planned by SP and Milwaukee." *Ibid.*

This discussion strikes us as initially misdirected because it ignores the prospective presence of Milwaukee in this area. In 1966 and 1967, Milwaukee trains were still running no closer to Portland than Longview, Washington, 46 miles away. All through the Commission proceedings, however, it was assumed by all concerned that pursuant to Condition 24 (a) of the Northern Lines merger, Milwaukee would soon be operating directly into Portland over Burlington Northern tracks, as it is today. Granted that Milwaukee had only 1% of Peninsula's traffic in 1966 and 1967, the Commission pointed to no evidence that the Milwaukee share would continue to be this small after affirmance of the Northern Lines merger.

The next difficulty with the Commission's approach relates to the potential growth of Peninsula traffic. The *raison d'être* of this litigation has been the possibility that Peninsula would become the northern access to Rivergate. As we have already noted, this possibility may be remote, given the physical limitations of Peninsula's present facilities. But the Commission nowhere states that the possibility is too speculative to be considered in this litigation. The paragraph we have just quoted, then, reads strangely indeed; for *if* Peninsula becomes the northern route into Rivergate, the estimates we have been given indicate that daily traffic over its line would increase from the 1967 rate of 30 cars per day to over 300 cars per day, assuming that a roughly equal number

of cars go out over each of the northern and southern routes from Rivergate. Yet according to the principle announced by the Commission, the public interest requires that Burlington Northern's and UP's 80% share of this potentially enormous traffic be protected.

Such an approach seems to us to fly in the face of the well-settled principle that the Commission is obligated to consider the anticompetitive effects of any § 5 (2) transaction. *McLean Trucking Co.* v. *United States,* 321 U. S. 67, 83–87 (1944); *Northern Lines Merger Cases,* 396 U. S. 491, 511–516 (1970). It is not necessary to invoke the precise terms of Condition 24 (a) and decide their applicability to this case, to take cognizance of the fact that prior to the Northern Lines merger, Milwaukee was a weak carrier in the Northern Tier of States. *Northern Lines Merger Cases,* 396 U. S., at 504, 514–516. Condition 24 (a) was not intended to foreclose consideration of Milwaukee's competitive position *vis-à-vis* Burlington Northern in any other proceeding. Both Milwaukee and SP were entitled to explicit consideration of their economic positions as compared with that of Burlington Northern and UP or, at least, a clear statement why such an inquiry was not appropriate.

Even the one case cited by the Commission in support of its general principle, *Minneapolis, St. P. & S. S. M. R. Co. Acquisition,* 295 I. C. C. 787, 802 (1958), undercuts the Commission's reasoning. There, the Commission denied applications of other lines for permission to acquire tracks and to undertake new construction in territory traditionally served by the Chicago & North Western Railway Co.; the latter's economic vulnerability made preservation of its exclusive territory important to the public interest.

There is no indication in the present case that Burlington Northern and UP are economically vulnerable, or that they in any way need their present share of Penin-

sula traffic to serve the public interest. We are confronted with two railroads that already control one actual route into Rivergate (via Barnes Yard) and one potential route (any spur leading off the Burlington Northern-SP&S main-line tracks), and that now seek to acquire, for themselves alone, the one remaining route. The Commission's entire discussion of the anticompetitive aspects of this acquisition can be summed up as follows: to the extent that SP and Milwaukee may gain by four-railroad ownership of Peninsula, Burlington Northern and UP will lose; *therefore* the petitions for inclusion are denied. We do not approve this approach to the case.

Despite what we have said about the Commission's apparent reasoning, it does not necessarily follow that the result it reached was incorrect. Given the uncertainty about the northern access to Rivergate, and given the apparent fact that physical operation over Peninsula and into Rivergate was not at issue, approval of the purchase by Burlington Northern and UP alone, with the eight attached conditions, may be the result most in the public interest at the present time. We note that the Commission retained jurisdiction over the proceedings.

But it is not the role of this Court to arrive at its own determination of the public interest on the facts of this case. Our appellate function in administrative cases is limited to considering whether the announced grounds for the agency decision comport with the applicable legal principles. *SEC* v. *Chenery Corp.*, 318 U. S. 80, 87–88 (1943). In this proceeding—where the record is already confused by ambiguities over what was thought to be at issue—we cannot say that the grounds for the agency decision are consistent with the "public interest" standard found in the Interstate Commerce Act. We must reverse and remand for further proceedings.

### C. *Southern Pacific's § 3 (5) Applications*

We turn to SP's applications for trackage rights which would permit it to run trains directly to Peninsula from East Portland. According to the Commission:

> "The intent of Congress in enacting section 3 (5) was to provide a method of avoiding the necessity for incurring unnecessary expense in duplicating existing terminal facilities by a railroad entitled to serve a particular territory." 334 I. C. C., at 435.

Since SP was "not entitled to serve Peninsula or Rivergate," it went on,

> "we need not reach the questions of whether common use of the facilities involved would be practicable or would substantially impair the ability of Peninsula and UP to handle their own business." *Id.*, at 436.

According to the rule applied here, if a railroad is not "entitled to serve" a particular territory, the Commission conclusively presumes that granting § 3 (5) rights would not be in the "public interest." Whether or not such a *per se* rule is permissible under § 3 (5) strikes us as a substantial question of statutory construction. For the following reasons, however, we decline to decide this question in the instant case and include these § 3 (5) proceedings in our remand to the Commission.

First, we note that the two cases cited by the Commission in support of its announced rule, *Use of Northern Pacific Tracks at Seattle by Great Northern,* 161 I. C. C. 699 (1930), and *Seaboard Air Line R. Co.—Use of Terminal Facilities of Florida East Coast R. Co.,* 327 I. C. C. 1 (1965), do not directly present the question at issue, since in each case the Commission decided that the applying railroad was entitled to serve the area and went on to grant the requested trackage rights.

Second, we note that the Commission's brief now defends the ruling below on broader grounds than those that were announced. This leads us to doubt the extent to which the Commission's announced rule is settled ICC law.

Third, the question of § 3 (5) relief may become moot if the Commission, on remand of the § 5 (2) petitions for inclusion, reverses itself and requires trackage rights for SP as a condition for approval of the purchase of Peninsula, and if the purchase is then consummated.

Fourth, the § 3 (5) applications were considered in close connection with the § 5 (2) petitions for inclusion by both the Commission and the hearing examiner. We cannot say with assurance that the Commission would approach the § 3 (5) applications in the same way after reconsidering the petitions for inclusion in light of Parts II (A) and (B) of this opinion.

The judgment of the District Court is reversed. The case is remanded to the District Court with instructions that it remand to the Interstate Commerce Commission for further proceedings consistent with this opinion.

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

[Schematic map follows this page.]

**VANCOUVER WN**

RIVERGATE

HAYDEN ISLAND

COLUMBIA RIVER

**INDUSTRY**
A OREGON STEEL MILL
B COLLIER CARBON &
  CHEMICAL CORP.
C ASH GROVE CEMENT CO.
D CROWN ZELLERBACH
  WATERWAY TERM.
E CROWN ZELLERBACH
  POLE YARD

A
B
C
D

E

**PORTLAND**

WILLAMETTE

SWAN IS.

RIVER

UNION PACIFIC TRACKS CONNECT
AT TROUTDALE, 15 MILES EAST OF
EAST PORTLAND

N

**YARDS**

. WILLBRIDGE - B.N.
. GUILD'S LAKE - PORTLAND
  TERM.
. HOYT ST. - B.N.
. BROOKLYN - S.P.
. EAST PORTLAND - S.P.
. ALBINA - U.P.
. NORTH PORTLAND - PENINSULA TERM.
. VANCOUVER - B.N.
. BARNES - U.P.

**TRACKS**
PENINSULA TERM.
UNION PACIFIC
BURLINGTON NORTHERN - S.P. & S.
SOUTHERN PACIFIC
PORT OF PORTLAND