NEW YORK CENTRAL RAILROAD COMPANY, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

National Motor Freight Traffic Association, Inc., the Eastern Central Motor Carriers Association, Inc., Boss-Linco, Inc., Interstate Motor Freight System, and Roadway Express, Inc., Waterways Freight Bureau, and the American Waterways Operators, Inc. and the Great Lakes Ship Owners Association, Intervening Defendants.

United States District Court
S. D. New York.
June 14, 1961.

948

Robert D. Brooks, New York City (Alfred A. Green and William C. Leiper, New York City, on the brief), for plaintiff.

Michael I. Miller, Atty., Dept. of Justice, Washington, D. C. (Lee Loevenger, Asst. Atty. Gen., and Robert M. Morgenthau, U. S. Atty., New York City, on the brief), for defendant United States.

Leonard S. Goodman, Atty., Interstate Commerce Commission, Washington, D. C. (Robert W. Ginnane, Gen. Counsel, Interstate Commerce Commission, Washington, D. C., on the brief), for defendant Interstate Commerce Commission.

Frederick A. Babson, Jr., Washington, D. C. (Kenneth J. McAuliffe, New York City, Clyde B. Aitchison and John R. Turney, Washington, D. C., on the brief for Motor Carriers and Motor Carrier Ass'ns; Harry C. Ames, Washington, D. C., and Kenneth J. McAuliffe, New York City, on the brief, for Waterways Freight Bureau; and Kenneth J. McAuliffe, New York City, and John H. Eisenhart, Jr., Washington, D. C., on the brief for the American Waterways Operators, Inc. and the Great Lakes Ship Owners Ass'n), for intervenors.

Before FRIENDLY, Circuit Judge, and PALMIERI and METZNER, District Judges.

FRIENDLY, Circuit Judge.

This is an action by the New York Central Railroad, 28 U.S.C. §§ 1336, 2284 and 2321–2325, to enjoin orders of the Interstate Commerce Commission, in I. & S. Docket No. 7250, 313 I.C.C. 247, directing the Central to cancel tariffs, which had become effective due to expiration of the seven months' period of suspension, 49 U.S.C.A. § 15(7), establishing reduced commodity rates on rugs and carpeting in carloads from Amsterdam, New York to Chicago, Illinois. Judge Palmieri declined to grant a temporary restraining order; the case is now before us on application for final relief.

The regularly established rail and motor carrier rates for this traffic are, summarily stated, 185 cents per 100 pounds for a minimum of 24,000 pounds, and, in the case of the rail rates, 148 cents on weight in excess thereof. The tariff here directed to be cancelled provided for a rate of 155 cents for a minimum of 30,000 pounds and 125 cents on weight in excess of the minimum. However, and this is the bite of the case, the reduced rate was available only if the shipper executed a contract, in a form contained in the tariff, obliging him to move at least 80% of his annual Amsterdam-to-Chicago traffic over the Central; in the event of his failure to do that, the higher regular rate would apply. The contract contained provisions requiring the shipper to furnish an indemnity bond to insure such additional payment and to permit inspection of his records, and prohibiting the Central from voluntarily increasing the rates during the year, as well as other clauses not here material. "There is no dispute as to the compensativeness of the proposed rates.", 313 I.C.C. at 249.

After taking evidence in the form of verified statements, the Commission directed cancellation of the tariff. How the Commission did this needs be stated in some detail, since much of the Central's case hinges upon it.

The Report starts with 7½ printed pages headed "By the Commission" but actually presenting the views of three of

the ten Commissioners then in office, unnamed in the report but in fact Commissioners Hutchinson, Tuggle and Goff. This opinion begins by reciting the tariffs, the economic background and the contentions of the Central and of opposing truck and water carriers. It says, *inter alia,* that "no sound classification basis appears for different rates on the same or substantially the same tonnage, dependent only on the proposed contractual arrangement.", p. 250; that under the proposed rates "it would be entirely possible for a shipment from a contracting shipper to be transported at the lower rate in the same train between the same two points with a shipment of equal or greater volume from a non-contracting shipper, without any discernible differences in transportation circumstances", p. 251; that "there is no rational basis for affording an 80-percent user a 13-percent reduction in the normal rates on a 40,000-pound shipment, as here proposed, while denying the reduction to one who is a 70-percent or a 75-percent user", p. 251; and that "there is no assurance that an 80-percent user would ship a regular and predictable volume of freight per day, week, or month." All this seems to presage a conclusion that the rates violated § 2 or § 3(1) or the Elkins Act, 49 U.S.C.A. §§ 2, 3(1), 41(1). Instead, after an intervening passage, pp. 252–254, primarily concerned with the National Transportation Policy, which appears in 49 U.S.C.A. note preceding § 1, quoted in the margin,[1] the Report says "In view of our conclusions under section 1 of the act, there is no need to con-

sider further the allegations under sections 2 and 3, and under the Elkins Act," p. 254, and concludes that the tariffs would constitute a "destructive competitive practice" violating the National Transportation Policy, as read into § 1, primarily in two respects. The first is that the indicated extension of the practice by the Central and the inevitable response of other rail, motor and water carriers would cause "the destruction in large measure of what is in general a just, reasonable, and otherwise lawful rate structure necessary to maintain an adequate national transportation system," p. 252. The second is that the effect of a contract such as proposed "is to destroy competition for the duration of the contract", since "During the term of the contract, and especially during its final months, the shipper's vested interest in the reduced rate would discourage or prevent acceptance of an offer of superior transportation service at an equivalent or lower rate, nullifying any inherent advantages of other transportation agencies as a competitive factor", p. 253.

Commissioner Murphy filed a concurring opinion stating he agreed "with the findings and conclusions of the majority except that I would also find that the rates under investigation are in violation of sections 2 and 3, and the Elkins Act", p. 254. Commissioner Walrath, joined by Commissioner Webb, was "reluctantly constrained to agree with the result reached by the majority" but objected to "gratuitous dissertation implying that the proposed rates are unjustly discriminatory and unduly preferential

---

1. "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act * * *, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or un-

fair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act * * * shall be administered and enforced with a view to carrying out the above declaration of policy."

and prejudicial within the meaning of sections 2 and 3 of the act." Commissioners Winchell and McPherson concurred in the result. Commissioner Freas, joined by Commissioner Herring, dissented; they stressed the desirability of permitting "experimentation within legal limits" and thought "An attempt by means otherwise lawful to stem * * diversion or to regain traffic already lost can hardly be called unduly destructive."

The Central's principal attack is that the Commission failed to articulate the basis for its disapproval with the clarity required by such decisions as United States v. Chicago, M., St. P. & P. R. Co., 1935, 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023; Atchison, T. & S. F. Ry. Co. v. United States, 1935, 295 U.S. 193, 201–202, 55 S.Ct. 748, 79 L.Ed. 1382; and the two Chenery decisions, Securities and Exchange Commission v. Chenery Corp., 1943, 318 U.S. 80, 87, 63 S.Ct. 454, 87 L.Ed. 626 and 1947, 332 U.S. 194, 196–197, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995. See also Mr. Justice Frankfurter, concurring, in Secretary of Agriculture v. United States, 1956, 350 U.S. 162, 175, 76 S.Ct. 244, 100 L.Ed. 173. An initial phase of this claim, that there was no conclusion on which a majority of the Commission agreed, is quite clearly unfounded. To be sure, it is somewhat hard to understand how the two Commissioners who concurred only in the result could not have found in the three prevailing opinions some one with which to agree or, on a matter of this importance, why they did not at least elucidate why they could not. Neither is the concurring opinion of Commissioners Walrath and Webb fully understood by us; we find it somewhat hard to find a formula that rationally reconciles their belief that "Contract rates could well mean the end of a national transportation system, either as we have known it (highly workable despite its imperfections), or, as many hope to see it, a truly coordinated system featuring the use of each mode of carriage under single billing", their statement they were not certain they would reach the same adverse "result in all cases involving contract rates", and their disapproval of the instant ones. Still their ultimate conclusion is plain, and even if we were to eliminate the votes of Commissioners Winchell and McPherson altogether, six commissioners would have joined in concluding that the rates "are unjust and unreasonable in that they constitute a destructive competitive practice within the meaning of the national transportation policy declared in the act."

The reference to "unfair or destructive competitive practices" came into the Interstate Commerce Act in the declaration of policy of the Motor Carrier Act of 1935, 49 Stat. 543. This language was later embodied in the preamble to the Transportation Act of 1940, 54 Stat. 899. The legislative history cited to us by the parties does not much illumine its content; neither, in any significant degree, do the decisions of the Commission to which we have been referred. More light is shed by earlier enactments using language not dissimilar. One that comes readily to mind is § 5(a) of the Federal Trade Commission Act of 1914, § 15 U.S. C.A. § 45(a), which declared unlawful "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." Although these words themselves demand interpretation, the legislative history makes it plain they were intended to go somewhat beyond common law concepts, see F. T. C. v. R. F. Keppel & Bro., Inc., 1934, 291 U.S. 304, 310–314, 54 S.Ct. 423, 78 L.Ed. 814, and they have come to be understood as authorizing the Federal Trade Commission to proscribe at least some sorts of overly aggressive competition that would not have been deemed unlawful without them. As was said in Hastings Manufacturing Co. v. F. T. C., 6 Cir., 1946, 153 F.2d 253, 257, concerning a manufacturer who bought products of other manufacturers from distributors and also made loans to distributors and guaranteed them increased profits as compared with those previously obtained, " * * * acts not in themselves illegal or criminal, or even immoral, may, when repeated and

continued and their impact upon commerce is fully revealed, constitute an unfair method of competition within the scope of the Commission's authority to regulate and forbid." Simultaneously with the enactment of this general standard, Congress, in the Clayton Act, specified certain types of competition as unlawful—one of them, § 3, 15 U.S.C.A. § 14, to "fix a price charged * * *, or discount from, or rebate upon such price", in the case of sales or leases in commerce, "on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller", where the effect may be to substantially lessen competition or tend to create a monopoly. Relevant also is the provision in § 14, Third of the Shipping Act of 1916, 46 U.S.C.A. § 812, making it unlawful for the water carriers regulated thereby to "Retaliate against any shipper" by refusing space "or resort to other discriminating or unfair methods, because such shipper has patronized any other carrier or has filed a complaint charging unfair treatment, or for any other reason", a provision held in Federal Maritime Board v. Isbrandtsen Co., Inc., 1958, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926, to place a "dual rate" system dependent on exclusive patronage beyond the Maritime Commission's power to approve. We do not mean either that the general words in the National Transportation Policy, "unfair or destructive competitive practices", condemn per se all arrangements like those branded by express language in § 3 of the Clayton Act and in § 14, Third of the Shipping Act or, on the other hand, that the words of the Policy were limited

to the precise practices so previously proscribed; we do mean that these earlier statutes give an idea of the kinds of competitive practices that Congress authorized the Interstate Commerce Commission, in the exercise of its informed judgment, to decline to countenance.

If this be sound, it is reasonably clear both that the Commission was authorized to find that a tariff such as that here filed by the Central was an "unfair or destructive competitive practice" and that the Commission's Report was adequate to that end. Plainly such a tariff would violate § 3 of the Clayton Act if that applied to services; it would be no defence either that no penalty other than loss of the discount would be suffered by using the services of competitors, see Carter Carburetor Corp. v. F. T. C., 8 Cir., 1940, 112 F.2d 722, 732, or that competitors could employ the same device, see F. T. C. v. R. F. Keppel & Bro., supra, 291 U.S. at pages 312–313, 54 S.Ct. at page 426. The effect of such a contract upon competition is quite different from that of mere reduction in charges. In the latter case a competitor who meets the reduction is in as good a position to compete as theretofore; here, even if he meets the contract tariff with a similar one, he has some initial handicap, and whichever competitor gets the traffic, the other is then in a poor position to compete. All this would be a valid consideration for the Commission if only competing railroads were involved; it is doubly so in view of Congress' direction in the National Transportation Policy "to recognize and preserve the inherent advantages of each" mode of transportation.[2]

Taking the Commission's other conclusion, that a general adoption of contract tariffs "would be the destruction

---

2. We see no inconsistency, such as the Central does, between this reasoning and the Commission's having not merely permitted but prescribed commutation fares, Passenger Fares between District of Columbia and Nearby Virginia, 258 I.C.C. 559, 569–570 (1944). Without going into other factors distinguishing commutation fares, it is enough that such fares involve savings in sales expense, consistency of use, or both, not here demonstrated, and that the National Transportation Policy could hardly be read to have made a differential long permitted by § 22 of the Act, 49 U.S.C.A. § 22 into an "unfair or destructive competitive practice."

in large measure of what is in general a just, reasonable and otherwise lawful rate structure necessary to maintain an adequate national transportation system," the Central criticizes this as contrary to a statement, in United States v. Chicago, M., St. P. & P. R. Co., supra, 294 U.S. at page 509, 55 S.Ct. at page 466, that "The threat of such a [rate] war may be a reason for rejecting a new schedule" only "if the rate relation previously existing is a fair one, or * * * if the commission is without power to avert the reprisals and thereby nullify the threat." It contends that the Commission had no basis for finding the countrywide rate structure to be "in general just, reasonable and otherwise lawful", and also that the Commission has ample power to stop the spread of contract rates whenever it should find they were having a harmful effect. This is to apply Mr. Justice Cardozo's words to a situation wholly different from that to which they were addressed. The schedules that had been cancelled by the Commission in the Milwaukee cases involved no novel rate-making principle; they reduced the rates between certain Indiana mines and certain Illinois points so as to restore a relationship between the Indiana mines and mines near Springfield, Illinois that had long existed until upset by a series of other rate changes initiated by a decrease in the Illinois intrastate rates. Quite naturally, the Court insisted that the new schedules ought not be cancelled unless and until the Commission found that a rate relationship differing from the historic one was a fair "rate relation", and that this conclusion was not to be gainsaid because of a threat of further reduction in the Illinois rates, which were "subject to the power of the Commission, which may keep the changes within bounds." The Court scarcely meant by all this to say that the Commission was powerless to prevent a novel rate making practice, which it believed would undermine the historic rate structure whereby carriers may freely compete for particular shipments on the basis of price and service,

a structure the Commission might competently conclude had served the national interest generally, unless it was able to and did find that every single rate in that structure was precisely fair and reasonable. Similarly, although allowing the instant rates to become effective would, of course, not preclude the Commission's taking contrary action in the future, the Commission was not compelled to permit the experiment, even if we assume it might lawfully have done so. There was no showing of circumstances uniquely demanding or justifying this practice with respect to the movement of rugs and carpeting from Amsterdam to Chicago. Indeed, the matter seems rather to have been presented as a test case; as stated in the Report, p. 252, "The respondent concedes that if these rates are approved it will extend contract rates to other points and other commodities, and the motor carriers flatly state that they will follow."

One other contention of the Central must be mentioned. It calls our attention to a statement by then Chairman Freas before a subcommittee of the Senate Committee on Interstate and Foreign Commerce, in the hearing which led to the Transportation Act of 1958, 49 U.S.C.A. § 1231 et seq., 72 Stat. 568, 85th Cong., 2d Sess. Part 3, pp. 1899–1900, in which, after referring to the contract rate practice "now invoked in Canada and in some of the other foreign countries", the Commissioner said "there was nothing in the law now to prevent it so long as the rate adjustment does not create undue discrimination or preference and prejudice" and "our specific recommendation * * * is that there is nothing for the Congress to do." This, says the Central, is quite inconsistent with the Commission's Report here, holding, over Commissioner Freas' dissent, that there is something "in the law to prevent" the proposed rates even though these have not been found to violate §§ 2 or 3 or the Elkins Act. One can readily understand that, after the Commissioner's statement, the Central might have expected a more favorable reception.

*of its* proposal. However, even passing the points that Chairman Freas' remark was addressed to "agreements with shippers for lower rates \* \* \* where justified by savings in cost in return for a guaranteed quantity of tonnage or guaranteed proportions of the shipper's total volume", savings not shown here, and that he also characterized this as "a highly controversial matter and one on which the Commission has not had occasion to express itself", it would be distilling sunbeams from cucumbers to say that such a statement before a Senate subcommittee constituted an administrative construction of the National Transportation Policy binding either *ex proprio motu* or because of the Congressional inaction it may have helped to induce.

The United States, the Commission and the intervening motor and water carrier defendants have presented other contentions in support of the order which we find it unnecessary to consider. The injunction is denied and the complaint dismissed.