**NATIONAL GYPSUM COMPANY (HURON CEMENT DIVISION), Buffalo, New York and the Algoma Steel Corporation, Ltd., Sault Ste. Marie, Ontario, Canada, Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Washington, D. C., Defendants, and The Baltimore and Ohio Railroad Company et al., Intervening Defendants.**

### No. 71 Civ. 542.

United States District Court,
W. D. New York.

Feb. 5, 1973.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y., and Rice, Carpenter & Carraway, Washington, D. C., for plaintiffs.

Walker B. Comegys, Acting Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., and C. Donald O'Connor, U. S. Atty., Buffalo, N. Y., for the United States.

Fritz R. Kahn, Gen. Counsel, Geraldine R. Keyes, Atty. I. C. C., Washington, D. C., for I. C. C.

Joseph L. Lenihan, Louisville, Ky., Richard J. Murphy, Philadelphia, Pa., Charles C. Rettberg, Jr., Cleveland, Ohio, Donald M. Tolmie, Roanoke, Va., and Ohlin, Damon, Morey, Sawyer & Moot, Buffalo, N. Y., for intervening defendants.

Before MANSFIELD, Circuit Judge, and HENDERSON and CURTIN, District Judges.

MANSFIELD, Circuit Judge:

Plaintiffs have instituted this action pursuant to 28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325 to set aside a report and order of the Interstate Commerce Commission ("Commission") to the effect that proportional rates charged by 39 intervening railroad defendants ("the railroads")[1] for transportation of coal from points in the Appalachian coal fields to Toledo, Ohio, where the coal is transshipped by lake vessel to plaintiffs' plants on the upper Great Lakes, are neither discriminatory nor unreasonable and therefore do not violate §§ 1, 2 and 3 of the Interstate Commerce Act.[2]

The Huron Cement Company of National Gypsum Company ("Huron"), one of the plaintiffs, operates a cement plant at Alpena, Michigan. The Algoma Steel Corporation Ltd. ("Algoma") operates steel mills in Sault Ste. Marie, Ontario, Canada. Both use large quantities of coal shipped to their plants from the Appalachian coal fields. The coal used by Huron is known as bituminous steam coal, whereas most of the coal used by Algoma is metallurgical coal.

The Commission's decision followed plaintiffs' filing of complaints charging that the railroads, named therein as defendants, had failed to establish and maintain fair, reasonable and non-discriminatory proportional rates for transportation of coal from the mines to Toledo, Ohio, for transshipment by water. Hearings were held at which evidence was introduced. In a report and recommended order dated May 25, 1967, the Hearing Examiner found that the rates did not violate §§ 1 and 3 of the Act, but that they violated § 2 for the reason that different rates were charged to different customers for like service in the transportation of traffic under substantially similar circumstances and conditions. On December 11, 1968, Division 2 of the Commission filed its report and order, 332 I.C.C. 655, adopting the Hearing Examiner's findings as to the claims based on §§ 1 and 3, but reversing his finding as to § 2 and holding that the rates were not unlawfully discriminatory. Review was declined by the full Commission. Thereafter plaintiffs dropped their claims of violation of § 3.

1. The Commission's decision is reported at 332 I.C.C. 655. By order of this court dated March 24, 1972, 39 railroad companies were permitted to intervene as defendants pursuant to Rule 24(a)(1) and 28 U.S.C. § 2323 without objection on the part of plaintiffs.

2. Section 1(5) of the Interstate Commerce Act, 49 U.S.C. § 1(5), provides:
"All charges made for any service rendered or to be rendered in the transportation of passengers or property, or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."
Section 1(6) of the Interstate Commerce Act, 49 U.S.C. § 1(6), provides in pertinent part:
"It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made

or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, . . . ."
Section 2 of the Interstate Commerce Act, 49 U.S.C. § 2, provides that:
"If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."
The claim based on alleged violation of § 3 has been dropped.

The case has been submitted to us for summary judgment, plaintiffs contending that as a matter of law the conclusions of the Commission were erroneous and should be set aside. Defendants, on the other hand, contend that the action should be dismissed. We grant summary judgment dismissing the complaint.

 Upon this review we are limited to a determination of whether the Commission's judgment and order are within its statutory powers and whether its findings are rational and based on substantial evidence. Illinois C. R. Co. v. Norfolk & W. R. Co., 385 U.S. 57, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); Universal Camera Corp. v. Labor Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Due deference must be given to the Commission's expertise in the determination of the reasonableness of rates, Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 251, 71 S.Ct. 692, 95 L.Ed. 912 (1951), and plaintiffs bear the burden of making a convincing showing that the rates are unjustly discriminatory or unreasonable, Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968) (quoting from FPC v. Hope Natural Gas Co., 320 U.S. 591 at 602, 64 S.Ct. 281, 88 L.Ed. 333).

The facts as found by the Commission are for the most part beyond dispute. The commodities in question, steam and metallurgical coal, are transported over the same rail routes from the same mine origin districts in West Virginia, Ohio, Pennsylvania and Kentucky to Toledo, Ohio, where the coal is dumped into lake cargo vessels for water transportation to various destinations on the Great Lakes. Since the railroads are not responsible for the water transportation, their sole service is the transportation of the coal from the mines to the port of Toledo. Despite the fact that this service consists of transporting the identical commodity (coal) between the same points over the same land routes, the railroads charge different proportional rail rates to receivers located at certain ultimate destinations on the Lakes than those charged to receivers at other destinations, depending on whether loss of the traffic to competitive lower cost fuels or transportation is threatened at the destination, e. g., residual oil, coal-slurry lines, natural gas, or lower transportation costs from other coal fields.

Where the railroads have faced such competition at certain locations, they have lowered their rates to meet it but have maintained their regular rate structure for coal destined for shipment to other destinations. For example, in 1961 the Detroit Edison Company took steps toward construction of a pipeline capable of carrying 4 million tons of coal annually in slurry form into this area at lower prices than would be paid for coal shipped over the routes of the intervening railroad defendants. Having previously been threatened with loss of transportation of coal when a pipeline was constructed from Cadiz, Ohio, to a utility in East Lake, Ohio, the railroads, rather than risk similar loss of transportation of 4 million tons annually into the Detroit Edison Company's area, published in 1963 an annual volume tariff which reduced the rate by 37½ cents per net ton, conditioned on the receipt of 6 million tons of steam coal annually for transportation into certain Michigan destinations and by 12½ cents per ton on tonnage in excess of 6 million tons.

In similar fashion train load rates on some coal shipped to eastern utilities were reduced by the railroads to meet competition from residual oil and minemouth generating plants. Further rate reductions, some in the form of minimum annual volume rates and others as reductions on single car or individual minimum shipments, were made to other points on the Great Lakes (e. g., Menominee, the Milwaukee-Racine area and Green Bay) in order to meet competitive rate reductions of other railroads for transportation of coal from the midwestern coal fields, and to meet or forestall natural gas competition (e. g., in the Milwaukee-Racine area) and water competition (e. g., at Muskegon, Essexville and Milwaukee).

The competitive rate reductions made by the railroads were limited strictly to those destinations where it was necessary to meet or counter competition and to the type of coal required to meet such competition. For instance, since metallurgical coal could not be furnished by competition at the lower rates, the railroads limited their reductions to steam coal and did not reduce the proportional rates for transportation of metallurgical coal.

Plaintiffs are located at ultimate destinations where the railroads have not faced loss of traffic to competitive lower rates. Hence plaintiffs pay higher rates than do receivers at certain other destinations for the same service. Huron, for instance, pays a proportional rail-cargo rate of $3.16 per net ton applicable to single-car movements of steam coal from Appalachian mines in the "Inner Crescent" area (embracing parts of eastern Kentucky, western and southern West Virginia and a portion of southeastern Virginia) to Toledo, Ohio, for transshipment to Huron's cement plant at Alpena, Michigan, whereas the rate for carriage of the same coal to Toledo for transshipment to other ultimate destinations on the Great Lakes in multiple car lots or guaranteed minimum annual volumes varies from $2.59 per net ton to $2.93½ per net ton. Algoma uses approximately 2½ million tons of bituminous coal for production of iron and steel at Sault Ste. Marie, of which 2 million tons consist of metallurgical or coking coal. It pays the same rate as Huron for transportation of steam coal from the Inner Crescent to Toledo, but pays the higher rate of $3.46 per ton for transportation of metallurgical coal from the same origin mines, without restriction as to the size of shipments or annual volume.

Plaintiffs contend that the higher rates charged to them by the railroads violate § 1 of the Interstate Commerce Act because (1) they are based upon the use to which the coal is to be put, and (2) they are unreasonably high since they exceed the rates assessed other re-ceivers of lake cargo coal for identical services performed under substantially similar circumstances. Plaintiffs further contend that the rates violate § 2 because they are unjustly discriminatory.

*The Claim that the Rates Violate § 1*

Plaintiffs' first contention is that the different rates published by the railroads for steam coal and metallurgical coal violate the basic rule against establishment of rates or classifications on the basis of the different uses to which the same commodity is to be put by the receiver. Interstate Commerce Commission v. Baltimore & O. Ry. Co., 225 U.S. 326, 32 S.Ct. 742, 56 L.Ed. 1107 (1912); Ex-River Coal from Mount Vernon, Ind. to Chicago, 294 I.C.C. 233 (1955); Food Machinery Corp. v. Alton & S. R., 269 I.C.C. 603, 606 (1948). Application of the rule, it is argued, would prohibit railroads from charging higher rates for transportation of coal to Toledo for eventual use for metallurgical purposes at Algoma's Sault Ste. Marie plant than for coal transported to Toledo for use in producing steam at Huron's plant in Alpena.

The linch-pin of plaintiffs' argument is that the characteristics and transportation circumstances of steam and metallurgical coals are identical, a proposition as to which plaintiffs bear the burden of proof. Differences in composition and value would justify a difference in rate. See Lynchburg Traffic Bureau v. United States, 225 F. Supp. 874 (W.D.Va.1963); W. R. Grace & Co. v. Illinois Cent. R. R., 323 I.C.C. 102 (1964); Holmes & Hallowell Co. v. Great N. Ry., 69 I.C.C. 11 (1922); Increased Rates on Coal and Petroleum Coke, 316 I.C.C. 159 (1962); Edmunds Chemical Co. v. Missouri Pac. R. R., 308 I.C.C. 656 (1959). Here there was evidence of such differences. There was a sworn statement by the witness Drake that "most coals used for steam are either poorly coking or relatively non-coking. High inherent ash or sulphur can eliminate an otherwise acceptable coal from metallurgical use, but usually of-

fers no particular problem for steam generation. Principally, as a matter of economics, Algoma uses coals for steam purposes which are not particularly suited for coking." He further stated that "coking coals normally command a higher price than steam coals." This evidence was accredited by the Hearing Examiner who made findings accordingly.

In view of these differences we find no merit in plaintiffs' contention that the rates for steam and metallurgical coal should be the same. It overlooks the recognized fact that these two coals have different chemical characteristics, market prices, and competitive influences. See Wyandotte Chemicals Corp. v. The Baltimore and Ohio Railroad Company et al. (not published), I.C.C. Dkt. No. 34460 (Sub. No. 1), decided June, 1965.

Plaintiffs' next contention is that the rates published by the railroads for transportation of coal to Toledo for transshipment as lake cargo are unreasonably high, and violate the principle that the general rate structure for an area should be "relatively reasonable," with rates to one destination maintained in a reasonable relationship to those for traffic to other destinations. See Lake Cargo Coal from Ky., Tenn., Va. & West Va. to Lake Erie Ports, 139 I.C.C. 367, 396–97 (1928). Plaintiffs argue that it is unreasonable to charge them $3.16 per ton for transportation of coal for which receivers at some other destinations pay lower rates, some as low as $2.41 per ton.

■■ Plaintiffs' argument falls before the long-established principle that depressed rates published to meet competition "cannot be relied upon to show that the compared rates are unreasonably high." Chamber of Commerce of Fargo, N. D. v. United States, 276 F. Supp. 301, 307–308 (D.N.D.1967); Wyandotte Chemicals Corp. v. The Baltimore and Ohio Railroad Company et al., *supra*; Atlantic Creosoting Co. v. Southern Ry. Co., 323 I.C.C. 533, 538 (1964); W. R. Grace & Co. v. Illinois Central R. Co., 323 I.C.C. 102, 111 (1964); Ameri-

can Bread Co. v. Atchison, T. & S. F. Ry. Co., 310 I.C.C. 196, 198 (1960); United States v. San Diego & A. E. Ry. Co., 308 I.C.C. 327, 332 (1959).

■ Lastly, we affirm the Hearing Examiner's rejection of plaintiffs' argument that the rates were unreasonable *per se* on the ground that they exceeded the railroads' out-of-pocket and variable costs. Assuming *arguendo* that this contention were established, it would not, standing alone, constitute a violation of § 1. General Motors Corp. v. United States, 207 F.Supp. 641, 648 (E. D.Mich.1962), aff'd, 324 F.2d 604 (6th Cir. 1963); National Starch & Chem. Corp. v. Atchison, T. & S. F. Ry., 325 I. C.C. 658, 667 (1965); Southeastern Assn. of R. & Util. Commrs. v. Atchison, T. & S. F. Ry., 321 I.C.C. 519, 545 (1964); American Colloid Co. v. Akron, C. & Y. R. Co., 321 I.C.C. 91, 113 (1963); Commodity Credit Corp. v. Texas & P. Ry. Co., 306 I.C.C. 525, 533 (1959); Feigenbaum & Arons v. Missouri–K.–T. R. Co., 299 I.C.C. 630, 632 (1957).

*The Claim of Unjust Discrimination in Violation of § 2*

■ It is not disputed that the higher rates charged by the railroads to plaintiffs for the identical transportation service rendered to others at lower rates (i. e., for rail carriage of the same commodity, coal, over identical routes between the same points (from mines to Toledo)) are discriminatory. However, not every discrimination in proportional rates is unlawful. In an early interpretation of the Interstate Commerce Act the Supreme Court made it clear, as the plain language of that statute indicates, that "It is not all discriminations or preferences that fall within the inhibition of the statute; only such as are unjust or unreasonable. . . . Indeed, the possibility of just discriminations and reasonable preferences is recognized by these sections. . . ." Interstate Commerce Commission v. B & O Railroad, 145 U.S. 263, 276–277, 12 S.Ct. 844, 848, 36 L.Ed. 699 (1892).

In a series of decisions since the *B & O Railroad* case, *supra,* the courts and Commission have delineated those circumstances and conditions deemed to have a sufficiently substantial effect upon carriers, shippers and consumers to warrant differences in rates and those conditions considered insufficient to permit such discrimination. For instance, the fact that receivers at an ultimate destination have differing uses for the same product is not a circumstance justifying a higher rate to one receiver than to the other. Interstate Commerce Commission v. B & O Railroad, 225 U.S. 326, 32 S.Ct. 742, 56 L.Ed. 1107 (1912). Nor may a rail carrier penalize a shipper who uses a cheaper non-rail mode of transportation for a prior leg of the shipment, such as a connecting water barge, by charging the shipper a higher proportional rate ex-barge than that charged to a shipper who uses an all-rail mode of transportation. Interstate Commerce Commission v. Mechling, 330 U.S. 567, 67 S.Ct. 894, 91 L.Ed. 1102 (1947).

For many years the Supreme Court has recognized that the carrier's necessity of meeting competitive conditions in order to retain business is an important consideration, which may provide a sufficient dissimilarity of conditions to warrant a reasonable difference in rates that will not be classified as unjustly discriminatory. In Texas & Pac. Railway v. Interstate Commerce Commission, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 (1896), the Texas & Pacific published a lower rate for transportation from New Orleans to California of traffic imported from Europe than for carriage of identical domestic traffic between the same points. The lower rate was justified as necessary to avoid the loss of the European traffic altogether to competition which would transport it to the California coast by water. Upholding the discrimination as justified, the Court stated:

"We think that congress has here pointed out that, in considering questions of this sort, the commission is not only to consider the wishes and interests of the shippers and merchants of large cities, but to consider also the desire and advantage of the carriers in securing special forms of traffic, and the interest of the public that the carriers should secure that traffic, rather than abandon it, or not attempt to secure it. It is self-evident that many cases may and do arise where, although the object of the carriers is to secure the traffic for their own purposes and upon their own lines, yet, nevertheless, the very fact that they seek, by the charges they make, to secure it, operates in the interests of the public.

\* \* \* \* \* \*

"The principal purpose of the second section is to prevent unjust discrimination between shippers. It implies that, in deciding whether differences in charges, in given cases, were or were not unjust, there must be a consideration of the several questions whether the services rendered were 'like and contemporaneous', whether the kinds of traffic were 'like'; whether the transportation was effected under 'substantially similar circumstances and conditions.' To answer such questions, in any case coming before the commission, requires an investigation into the facts; and we think that congress must have intended that whatever would be regarded by common carriers, apart from the operation of the statute, as matters which warranted differences in charges, ought to be considered, in forming a judgment whether such differences were or were not 'unjust.' Some charges might be unjust to shippers—others might be unjust to the carriers. The rights and interests of both must, under the terms of the act, be regarded by the commission." 162 U.S. 197, 218–219, 16 S.Ct. 666, 675, 40 L.Ed. 940.

We are not persuaded by plaintiffs' contention that the teaching of *Texas & Pac. Railway* is limited to a difference between import and domestic

traffic. The basis of the decision is much broader than that. It is grounded upon the principle that the necessity of meeting competition in order to retain traffic is a circumstance that will be given heavy weight in deciding whether a difference in rates is unjust or unreasonable. Just as the railroads were entitled in *Texas & Pac. Railway* to publish lower rates on import traffic in order to induce it to move through the affected ports rather than use cheaper water transportation, the railroads were here entitled to do likewise in order to avoid a very substantial loss of business and resulting revenue that might well have required them to charge even higher rates to plaintiffs than at present in order to meet the higher operating costs per ton that would result from the decline in volume of traffic.

The viability of the principle established by *Texas & Pac. Railway* has repeatedly been confirmed. Barringer & Co. v. United States, 319 U.S. 1, 63 S.Ct. 967, 87 L.Ed. 1171 (1943) (railroad permitted to eliminate a loading charge for cotton destined for Gulf ports in order to meet truck competition but to retain charge on cotton destined for other southeastern ports); Koppers Company v. United States, 166 F.Supp. 96, 101 (W. D.Pa.1958); Coal to New York Harbor, 311 I.C.C. 355 (1960); Consolidated Edison Co. of New York, Inc. v. Virginian Ry. Co., 292 I.C.C. 23, 35–38 (1954); Reduced Rates on Coal from the East to the Northwest, 292 I.C.C. 119, 137–38 (1954); Coal from Ky., Va., and West Va. to Virginia, 308 I.C.C. 99 (1959); Wyandotte Chemicals Corporation v. The Baltimore and Ohio Railroad Company et al. (not published) I.C.C. Dkt. No. 34460 (Sub. No. 1), decided June, 1965. The Commission's settled construction of § 2 is entitled to the "highest respect." United States v. Missouri Pacific R. Co., 278 U.S. 269, 280, 49 S.Ct. 133, 73 L.Ed. 322 (1929).

We find the present case to be substantially on all fours with Koppers Co. v. United States, 166 F.Supp. 96 (W.D. Pa.1958), which held that varying proportional rates on coal shipped by identical service from origin mines to Hampton Roads for transshipment by water to New York and New England did not violate § 2, since competitive conditions at the ultimate New England destinations, which did not exist at the New York destinations, justified a lower rate on shipments destined to the former. Similarly in Coal to New York Harbor, 311 I.C.C. 355 (1960), the existence of competition from unregulated carriage of cheaper residual fuel oil at specific destinations along the Atlantic seaboard was deemed a factor of sufficient importance to warrant rate reductions on coal shipped to such destinations, which were held not to constitute unjust discrimination in violation of § 2.

Wight v. United States, 167 U.S. 512, 17 S.Ct. 822, 42 L.Ed. 258 (1897), relied upon heavily by plaintiffs, is distinguishable on legally significant grounds. There the discriminatory rebate paid by the B. & O. Railroad to one receiver of beer shipments in Pittsburgh to cover the cost of cartage from the railroad depot to his place of business was not offered to any other competing receiver of beer in Pittsburgh, with the result that the allowance gave the recipient an advantage over his competitors. Although the rebate was intended to meet the competition of another railroad, it simultaneously had an adverse effect upon competition between receivers in the same city. Section 2 was enacted to prevent carriers from granting such discriminatory favors to competing receivers. However, no such counterbalancing circumstance is shown here. Each plaintiff pays the same rate as any other receiver in its community—no other shipper pays a lower rate.

Applying these principles here, plaintiffs' argument that the lower rates amount to nothing more than discrimination in favor of large volume shippers simply because they are big customers is countered by substantial evidence supporting the Commission's finding that each rate reduction was made in order to meet competition. Although the Com-

mission disagreed with the Hearing Examiner as to the § 2 claim, the disagreement was as to the applicable legal principles rather than as to the facts. Our views as to the interpretation of § 2 are in accord with those of the Commission.

Nor are we persuaded by plaintiffs' argument that the volume rates published by the railroads on coal shipped to certain ultimate destinations are unlawful. These rates were essential to meet competition for the reason that unless a receiver were given an incentive to ship all or most of his traffic by rail he would accept lower train load rates published by the railroads and at the same time patronize competing carriers or fuels for most of his needs, or even construct a coal-slurry pipeline for lower cost transportation of fuel. The minimum annual volume rates published by plaintiffs are not contract rates of the type condemned in Contract Rates, Rugs & Carpeting from Amsterdam, N. Y., 313 I.C.C. 247 (1961), aff'd sub nom. New York Central R. Co. v. United States, 194 F.Supp. 947 (S.D.N.Y.1961), aff'd per curiam, 368 U.S. 349, 82 S.Ct. 391, 7 L.Ed.2d 384 (1962), or in Guaranteed Rates, Sault Ste. Marie, Ontario to Chicago, 315 I.C.C. 311 (1961). Unlike the situation in those cases, there is no evidence that the minimum volume rates here threatened to destroy the rate structure in the Great Lakes or to suppress competition. Shippers are not obligated to ship any minimum percentage of coal by rail. Nor are they foreclosed from patronizing competing carriers. The shipper is free to ship all or any percentage of its traffic by competitive means. See Natural Gas Pipeline of America v. New York Central R. Co.. 323 I.C.C. 75, 82–83 (1964). In short, the opportunity to take advantage of the lower minimum annual quantity rates represents merely an option available to the shipper.

The action to set aside the report and order of the Interstate Commerce Commission is dismissed. Summary judgment will be entered accordingly.

It is so ordered.