**BURLINGTON NORTHERN RAILROAD COMPANY, Petitioner,**

v.

**UNITED STATES of America and The Interstate Commerce Commission, Respondents,**

**Baltimore and Ohio Railroad, et al., Intervenors.**

**No. 83–1058.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 21, 1983.

Decided April 6, 1984.

Richard J. Schreiber, Chicago, Ill., with whom Michael L. Sazdanoff, Chicago, Ill., was on the brief, for petitioner.

Sidney L. Strickland, Jr., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, and Lawrence H. Richmond, Deputy Asst. Gen. Counsel, I.C.C., Washington, D.C., were on the brief, for respondents. Barry Grossman and John P. Fonte, Dept. of Justice, Washington, D.C., for respondent U.S. of America.

Charles C. Rettberg, Jr., Cleveland, Ohio, with whom Richard B. Allen and Harry N. Babcock, Cleveland, Ohio, were on the brief, for intervenors.

Before GINSBURG and BORK, Circuit Judges, and McGOWAN, Senior Circuit Judge.

McGOWAN, Senior Circuit Judge:

Petitioner Burlington Northern Railroad (BN) seeks to overturn a decision of the Interstate Commerce Commission (ICC or Commission) discontinuing administrative complaint proceedings initiated by BN against the Baltimore and Ohio Railroad (B & O).[1] In its complaint to the Commission, BN charged the B & O with (1) discrimination and (2) failure to provide reasonable, proper, and equal facilities for the interchange of traffic, respectively in violation of sections 10741(a) and 10742 of the Interstate Commerce Act, 49 U.S.C. §§ 10741(a),

---

1. The complaint also named as a defendant the B & O's wholly owned subsidiary, the Baltimore and Ohio Chicago Terminal Railroad (B & OCT). BN filed its administrative complaint with the ICC pursuant to 49 U.S.C. § 11701(b) (Supp. V 1981). Judicial review of the agency action involved is available under 28 U.S.C.A.

10742 (Supp. V 1981).[2] Following a hearing, an Administrative Law Judge ruled favorably on BN's charge of discrimination, but otherwise dismissed the remaining portions of its complaint. On appeal, an ICC review board overturned the ALJ's finding of discrimination and ordered the underlying complaint proceedings discontinued as no further charges remained to be litigated. After the full Commission denied BN's subsequent request for discretionary review of the board's decision, the railroad filed its present petition for judicial review with this court. Because the agency's decision is supported by substantial evidence and correctly applies the controlling provisions of the Interstate Commerce Act, we affirm.

## I

The facts of this case revolve around the somewhat complex regulatory and infrastructural environment within which eastern and western railroads interchange traffic in the Chicago switching district. The Administrative Law Judge adequately reviewed those facts in his opinion. *Burlington Northern, Inc. v. Baltimore & Ohio Railroad,* No. 37515, slip op. at 1–10 (I.C.C. Nov. 3, 1981) (decision of ALJ). We therefore recount only as much of the relevant background as is necessary to decide the issues presented to us for review.

The present controversy centers on the interchange of eastbound BN traffic with the B & O at Chicago.[3] Because the two railroads' tracks are not physically contiguous, each relies on the services of intermediate switching carriers to deliver cars to the other. Several such intermediate carriers operate in the Chicago area, among them a wholly owned B & O subsidiary, the Baltimore and Ohio Chicago Terminal Railroad (B & OCT). Under longstanding Chicago custom, the intermediate switching charges involved in such deliveries are normally borne by the forwarding carrier, which in the case of the eastbound traffic at issue here is the BN.[4]

Under a 1963 agreement, the B & O in effect waived this long-standing custom by agreeing to absorb the B & OCT switching charges on eastbound deliveries between the two roads.[5] This arrangement remained in place until 1972, when the B & O unilaterally cancelled the agreement and thereafter sought to impose full intermediate switching charges on the BN. Subsequently, the two railroads negotiated a new agreement under which the B & O agreed to absorb one-half the switching charges otherwise due the B & OCT on eastbound BN deliveries. This latter arrangement continued until late 1977, when the BN discontinued using the B & OCT as an intermediate bridge carrier and transferred its business to the Belt Railway of Chicago.

## II

Petitioner BN challenges the ICC's discontinuance of complaint proceedings in this case. The railroad contends that, contrary to the agency's findings, the cancellation by the B & O of its original 1963 agreement amounts to unreasonable discrimination under section 10741(a) and to a failure to provide reasonable, proper, and equal facilities for the interchange of traf-

---

§§ 2321(a), 2342(5), 2344 (West 1978 & Supp. 1983).

**2.** BN also included in its complaint a charge under 49 U.S.C. § 10705 (Supp. V 1981). *See* Joint Appendix at 10. The railroad has apparently abandoned this latter charge in its petition for review. *See* Appellant's Brief at 13–26.

**3.** The BN is a western railroad generally serving points west of Chicago, while the B & O is an eastern railroad generally serving points east of that city. Both carriers interchange traffic at Chicago.

**4.** This custom is formally embodied in the division sheet governing the Chicago switching district. *See* Joint Appendix at 135–38 (Division Sheet X–12–0).

**5.** The agreement was actually executed between the B & O and the Chicago, Burlington and Quincy Railroad (CBQ), a predecessor road to the BN. For purposes of simplicity, however, we shall refer to the CBQ and BN throughout this opinion by the name of the successor railroad only.

fic under section 10742. We address each of these allegations in turn.

### A. *Price Discrimination*

■ Section 10741(a) of the Interstate Commerce Act bars railroads and certain other common carriers from charging different prices to different persons for like transportation services rendered under substantially similar circumstances. Regulated carriers that violate this prohibition commit unreasonable discrimination under the Act. 49 U.S.C. § 10741(a) (Supp. V 1981). BN bases its discrimination charge on the B & O's current practice of absorbing *all* intermediate switching charges on eastbound traffic delivered to the B & O by two other western railroads, the Chicago and Northwestern (C & NW) and the Chicago, Milwaukee, St. Paul and Pacific (Milwaukee). These arrangements stand in contrast to the B & O's refusal since 1972 to absorb any more than one-half the corresponding charges on similar eastbound traffic from the BN.[6]

As the parties correctly indicate, resolution of this charge hinges on proper interpretation of the statutory phrase "substantially similar circumstances." The agency found that the B & O does not interchange traffic with BN under circumstances substantially similar to those that obtain in its interchanges with the C & NW and Milwaukee, and that the defendant railroad therefore is justified in refusing to enter into the same agreement with the BN as it has with the other two railroads. *Burling-*

*ton Northern, Inc. v. Baltimore & Ohio Railroad,* No. 37515, slip op. at 8–9 (I.C.C. June 22, 1982) (decision of Review Board No. 1). The ICC review board based its findings of dissimilar circumstances on the C & NW's ability to deliver fully classified, run-through trains to the B & O and on the Milwaukee's precarious financial condition.

### 1. *The C & NW Connection*

We have little difficulty affirming the agency's decision regarding the C & NW connection. The record establishes that the C & NW fully classifies at least some of its eastbound traffic into trainload quantities before delivery to the B & O, although under Chicago custom responsibility for performing this service would normally rest with the B & O as receiving carrier. *See* Joint Appendix at 123–25. In exchange for this service, the B & O has agreed to absorb the full intermediate switching charges that the C & NW would otherwise have to bear as the delivering carrier.[7] The ICC review board found that the BN cannot pre-block its eastbound traffic to the same extent or in the same quantities as the C & NW, and that the two carriers therefore do not interchange traffic with the B & O under substantially similar circumstances. Although BN disputes the factual premise underlying this conclusion, the record contains ample evidence to support the agency's findings. *Compare* Appellant's Brief at 18–20 *with* Joint Appendix at 85–87, 90–91, 100–01, 160.

---

**6.** Technically these facts do not make out a prima facie case of section 10741(a) discrimination because they fail to allege that the railroad rendering the intermediate switching service (i.e., the B & OCT) has charged different prices for that service. Indeed, the prices charged by the B & OCT are fixed by Division Sheet X–12–0, and therefore do not vary. *See* Joint Appendix at 135–38. The dispute raised here is not over the compensation demanded by the B & OCT, but rather over which railroad shall pay that compensation, the BN or the B & O. Although such a dispute might raise issues under section 10701(a) (discriminatory division of joint rates), it would not normally implicate potential discrimination under section 10741(a). Nevertheless, because of the close financial ties that exist between the B & O and its B & OCT subsidiary,

it is conceivable that a B & O agreement to absorb B & OCT charges on behalf of a third carrier might be used to disguise what is in reality a discriminatory price reduction by the B & OCT to the third carrier. We find it unnecessary to explore this issue in greater detail, however, because we agree with the agency that substantially similar circumstances do not obtain between the BN, on the one hand, and the C & NW and Milwaukee, on the other, with respect to the transactions at issue in this case. *See infra* text following this note.

**7.** The B & O does charge the C & NW a puller fee of $14.81 per car, however, on the traffic involved. *See* Joint Appendix at 115–18.

Petitioner also challenges the legal standard that the ICC review board applied in gauging the type of circumstances that justify differential treatment under section 10741(a). Specifically, BN cites *Western Pacific Railroad v. United States*, 382 U.S. 237, 246, 86 S.Ct. 338, 344, 15 L.Ed.2d 294 (1965), for the proposition that such circumstances are limited to differences in operating conditions that substantially affect the allegedly discriminating carrier. Asserting that the ability to provide fully classified, run-through trains does not constitute such an operating condition, BN argues that the agency erred in distinguishing the C & NW connection on this basis. *See* Appellant's Brief at 18–20.

Petitioner fails to note, however, that the *Western Pacific* case involved discrimination, not under section 10741(a), but under the predecessor of section 10701(c) based on certain carriers' refusals to enter into the same joint rates with complainant as they maintained with complainant's competitor. *See* 382 U.S. at 239 (citing 49 U.S.C. § 3(4) (1964) (current version at 49 U.S.C. § 10701(c) (Supp. V 1981))). Such discrimination is distinct from that charged in this case, and for that reason the standard applied in *Western Pacific* is simply inapposite to the present controversy. We therefore need not decide here whether differential pre-blocking capabilities constitute "differences in operating conditions" sufficient to warrant the type of discrimination charged in that case. The record does satisfy us, however, that such varying capabilities do constitute "dissimilar cir-

cumstances," and that those circumstances adequately justify the differential treatment at issue here.[8] Because this was the proper inquiry under section 10741(a), and because the ICC review board correctly applied the controlling standard, we find no error in its decision in this regard.

### 2. *The Milwaukee Connection*

We likewise have little difficulty affirming the review board's finding of dissimilar circumstances with regard to the Milwaukee connection. The record shows that since 1972 the B & O has agreed to absorb the intermediate switching charges on eastbound Milwaukee deliveries because of that railroad's precarious financial condition. The B & O assented to this arrangement to help the Milwaukee avert bankruptcy and to preserve traffic that otherwise might be lost if that railroad were forced into reorganization or liquidation. *See* Joint Appendix at 98–99, 148–50. Because BN clearly does not share the Milwaukee's financial predicament, the two carriers do not interchange traffic with the B & O under substantially similar circumstances, and the B & O is therefore justified in making concessions to the Milwaukee that it has not made to petitioner.

Petitioner responds to this argument by again citing the *Western Pacific* decision, contending that a carrier's relative financial health cannot be taken into account to justify differential treatment under the narrow, "operating conditions" standard adopted in that case. We already have explained above why the *Western Pacific*

---

**8.** Simple economic analysis reinforces this conclusion. The transaction at issue here involves a triangular exchange in which the C & NW provides pre-blocking services to the B & O which in turn transfers cash to the B & OCT in exchange for the B & OCT's rendering intermediate switching services to the C & NW. *See supra* text accompanying note 7. One can easily recharacterize this arrangement as a series of two bilateral exchanges in which the C & NW first *provides* pre-blocking services to the B & O in exchange for cash, and in which the C & NW then transfers that cash to the B & OCT in exchange for intermediate switching services. Thus viewed, the transaction violates no law and certainly does not discriminate against peti-

tioner in any manner cognizable under section 10741(a).

Even if one views the B & OCT rather than the B & O as the discriminatory actor, *see supra* note 6, the result is no different. The transaction alleged under this version of the facts is identical to the triangular exchange described above, followed by a wash transaction in which the B & OCT transfers cash back to the B & O. (A wash occurs because the latter cash transfer wipes out the earlier B & O transfer of cash to the B & OCT.) Yet this arrangement is no different upon recharacterization from the series of two bilateral exchanges outlined earlier, followed by a dividend from the B & OCT to the B & O.

decision is not controlling in the present controversy. The ICC review board therefore correctly broadened its inquiry into substantially similar circumstances beyond a mere consideration of operating conditions. The needs to protect financially weakened carriers and to preserve traffic threatened by loss through bankruptcy are obviously factors that a railroad may weigh in considering whether to absorb intermediate switching charges on behalf of a connecting carrier. Moreover, ample precedent exists in the analogous case law governing rate discrimination to support this conclusion. *See, e.g., Texas & Pacific Railway v. ICC,* 162 U.S. 197, 218–19, 16 S.Ct. 666, 674–75, 40 L.Ed. 940 (1896) (difference in rates justified by need to retain traffic threatened by loss through intermodal competition); *National Gypsum Co. v. United States,* 353 F.Supp. 941, 947–48 (W.D.N.Y. 1973) (three-judge court) (difference in rates justified by need to retain traffic threatened by loss through intermodal competition and product substitution). We therefore have no hesitation in affirming the agency's finding of dissimilar circumstances in this instance either.[9]

B. *Failure to Provide Required Interchange Facilities*

Section 10742 of the Interstate Commerce Act requires regulated carriers to furnish "reasonable, proper, and equal facilities that are within [their] power to provide for the interchange of traffic between ... connecting line[s]." 49 U.S.C. § 10742 (Supp. V 1981). Petitioner alleges that this provision entitles it to a free route over B & OCT tracks to a designated point of interchange with the B & O. BN bases

this conclusion on a series of three assertions: First, long-standing custom requires the receiving railroad in a direct physical interchange to designate a point on its own line where it will receive traffic and to provide a free route over its tracks to that point for the delivering carrier. Second, where two railroads that share in a joint rate are not physically contiguous yet one of them enters into a comprehensive trackage rights agreement with an intervening switching carrier, in practical and legal effect a direct interchange is established. Third, because the B & O has such a trackage rights agreement with the B & OCT, a direct interchange exists between the B & O and BN which entitles BN to a designated point for delivery to the B & O and free passage over B & OCT tracks to reach that point. *See* Appellant's Brief at 5, 9–10, 22–24.[10]

Both the Administrative Law Judge and the ICC review board rejected this line of argument. *Burlington Northern, Inc. v. Baltimore & Ohio Railroad,* No. 37515, slip op. at 12–13 (I.C.C. Nov. 3, 1981) (decision of ALJ), *aff'd in relevant part,* No. 37515, slip op. at 5–6 (I.C.C. June 22, 1982) (decision of Review Board No. 1). Although it implicitly accepted petitioner's first point concerning the industry custom governing direct physical interchanges of contiguous railroads, the ICC review board was unpersuaded by the latter two points in petitioner's three-step analysis. Specifically, the board held that no direct interchange arises between two noncontiguous railroads participating in a joint rate merely because one of them executes a compre-

---

**9.** As an alternative ground for upsetting the review board's decision on this point, petitioner argues that because shippers normally designate the routing of their cargo, the B & O already has ample protection against traffic loss without the need to absorb intermediate switching charges on Milwaukee's behalf. *See* Appellant's Reply Brief at 7. Petitioner's criticism misses the point, however, that absorption was intended to preserve not merely the Milwaukee-B & O connection, but the underlying Milwaukee service itself. Obviously no amount of shipper designation would protect the B & O from losing its

connecting traffic, if under a plan of reorganization or liquidation Milwaukee service were seriously cut back or eliminated altogether.

**10.** Petitioner also contends that the B & O has violated its obligation under section 10742 to provide equal interchange facilities by in effect granting direct interchange privileges to the C & NW and Milwaukee while denying those same privileges to BN. *See* Appellant's Brief at 23–24. This argument is discussed in greater detail at *infra* note 14 and accompanying text.

hensive trackage rights agreement with an intervening switching carrier.

■ We can find little to fault in the review board's analysis of this issue. Even if an extensive trackage rights agreement does exist between the B & O and the B & OCT,[11] the B & O is under no obligation to exercise those rights on petitioner's behalf. Absent contrary stipulation in the lease or in the required ICC authorization, the exercise of trackage rights remains permissive with their holder. *Chicago, Rock Island & Pacific Railway v. Denver & Rio Grande Railroad,* 143 U.S. 596, 609, 12 S.Ct. 479, 483, 36 L.Ed. 277 (1892).[12] Certainly the three railroads involved here could seek to establish the functional equivalent of a direct physical interchange between the B & O and BN through appropriate negotiations among themselves. In the absence of such a consensual arrangement, however, the B & O remains free to refrain from utilizing its trackage rights and to continue conducting interchange operations through the intermediate switching services of the B & OCT. This is one permissible way for two noncontiguous railroads to interchange traffic, even though one of them has sole ownership of the intervening switching carrier. *See Grand Trunk Western Railroad v. Pere Marquette Railway,* 174 I.C.C. 427 (1931). The bare fact that the sole-owner railroad also holds trackage rights over the intervening carrier presents no reason to vary from the general rule announced in *Grand Trunk Western,* given the nonmandatory character of trackage rights authorizations.

Petitioner responds to these arguments by citing two previous ICC decisions in which the agency intimated that service by a carrier under a trackage rights agreement may have the practical and legal effect of establishing direct interchanges with otherwise noncontiguous carriers. *See* Appellant's Brief at 23 (citing *Chicago, Milwaukee, St. Paul & Pacific Railroad Trackage Rights,* 317 I.C.C. 14, 17 (1962); *New York, Susquehanna & Western Railroad Reorganization,* 257 I.C.C. 593, 668 (1944)). Other opinions not cited by the parties are to the same effect. *See, e.g., Port of Portland v. United States,* 408 U.S. 811, 838–39, 92 S.Ct. 2513, 2526–27, 33 L.Ed.2d 723 (1972). None of these decisions, however, is contrary to the principle announced by the ICC review board in this case. In each instance where the agency or a reviewing court has found a potential direct interchange based on service under a trackage rights agreement, that finding has been premised on the trackage rights holder's voluntary acquiescence in the arrangement. *See* 408 U.S. at 825–27, 92 S.Ct. at 2520–21; 317 I.C.C. at 17–18; 257 I.C.C. at 664–68. In no instance has a direct interchange been found to arise merely by operation of law or contrary to the current wishes of the trackage rights holder. The relevant case law therefore fails to establish the proposition petitioner urges upon us. Indeed, the decisions cited only lend further support to the position adopted by the ICC review board in its opinion.

Petitioner's final argument is that, even if the trackage rights agreement does not create a direct interchange by automatic operation of law, it does give the B & O the power to establish such an interchange and

---

**11.** The record is far from clear that an agreement was ever consummated and, even so, whether it continues in force today. *See* Joint Appendix at 244 (consummation required for ICC authorization to remain effective; no evidence of consummation presented by the parties); *id.* at 80, 112 (doubt that trackage rights were ever exercised or that they currently continue in force).

**12.** Petitioner challenges the relevance of the *Chicago, Rock Island & Pacific* decision to the present controversy, arguing that the Supreme Court in that case only addressed what rights the lessee under a trackage rights agreement may exercise vis-á-vis its lessor and not whether the lessee is obligated to exercise those rights on behalf of a third carrier. *See* Appellant's Reply Brief at 4. The Supreme Court's language, however, contains no such limitation. Moreover, the ICC considered the issue of third-party accommodation in *Peoria & Pekin Union Railway,* 93 I.C.C. 3, 12 (1924), and there found no reason to vary from the rule formulated by the Supreme Court in the *Chicago, Rock Island & Pacific* case.

therefore the obligation to do so under section 10742. In petitioner's words,

> Section 10742 provides that a carrier "shall provide reasonable, proper and equal facilities that are *within its power to provide* for the interchange of traffic...." The aforementioned trackage rights [agreement] gives B & O the power to provide a point of direct interchange with BN and the clear, unequivocal language of the Act mandates the use of that power.

Appellant's Reply Brief at 5 (emphasis added).[13]

We would be inclined to credit this argument if petitioner could show that the current interchange facilities available to it were somehow unreasonable, improper, or unequal. Yet we have already seen under the *Grand Trunk Western* holding discussed above that it is entirely reasonable and proper for two noncontiguous railroads to interchange traffic through an intermediate switching carrier rather than by direct connection, even though one of the railroads involved has complete ownership of the intermediate carrier. Likewise, our earlier resolution of the discrimination issue under section 10741(a) makes clear that existing interchange facilities are not discriminatory with respect to petitioner; no basis therefore exists for asserting their inequality.[14]

Although the predecessor of section 10742 required a carrier to furnish "*all* reasonable, proper and equal facilities" that were within its power to provide for interchanging traffic, 49 U.S.C. § 3(4) (1976) (restated at 49 U.S.C. § 10742 (Supp. V 1981)), and no substantive change was intended when Congress deleted the word "all" from its 1978 restatement of the section, *see* H.R.REP.No. 1395, 95th Cong., 2d Sess. 4, 9–10 (1978), U.S.Code Cong. & Admin.News 1978, 3009, 3017, 3018, courts have long recognized that when a carrier has the power to provide two or more options for interchanging traffic, each of which is independently reasonable, proper, and equal, it need not provide all such options to connecting lines but may instead offer only that option which best serves its own business interests, *see Oregon Short-Line & Utah Northern Railway v. Northern Pacific Railroad*, 61 F. 158, 161–62 (9th Cir.1894).[15] In interchanging traffic with western railroads at Chicago, the B & O has quite properly elected to utilize only one of the options available to it (intermediate switching via the B & OCT) and to forego exercising another (direct interchange under a trackage rights agreement). Because the ICC review board correctly recognized the propriety of the B & O's election in this regard, we affirm the agency's dismissal of petitioner's charge under section 10742.

**13.** For purposes of argument, we are willing to assume that the B & O does have the power under a current trackage rights agreement to establish a direct interchange with petitioner. *But see supra* note 11.

**14.** This observation disposes of the argument discussed at *supra* note 10. Indeed, the physical facilities available to petitioner are identical to those provided its competitors. The only dispute is over which railroad should bear the cost of utilizing those facilities, the delivering railroad or the B & O. Petitioner's charge of unequal interchange facilities under section 10742 is thus conceptually indistinguishable from its charge of price discrimination under section 10741(a). For this reason, our earlier resolution of BN's price discrimination charge necessarily settled its charge of unequal interchange facilities as well.

**15.** The legislative history supports this interpretation. In discussing the original section on the Senate floor, Senator Cullom explained that its purpose was "to require railroads to furnish to connecting roads all reasonable and proper facilities for the interchange of traffic that may be necessary for the convenience of the public, and to prevent one road, or a combination of roads, from 'freezing out' a connecting line by refusing to accept traffic from it or deliver traffic to it upon any terms, as has been done." 17 CONG. REC. 3470, 3472 (1886) (remarks of Sen. Cullom). In the present case, there is no allegation that direct interchange facilities are necessary to the public convenience or that the B & O has attempted to freeze out petitioner from interchanging traffic at Chicago. This observation, combined with the fact that petitioner currently has available to it reasonable, proper, and equal facilities for interchanging traffic, is dispositive of its charge under section 10742.

## III

For the foregoing reasons, we deny BN's petition to overturn the Interstate Commerce Commission decision under challenge in this action.

*It is so ordered.*